# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-12-00569-CR

**Brithe Thompson, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY**
**NO. 10-09499-1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING**

---

## O P I N I O N

A jury convicted Brithe Thompson, appellant, of possession of a prohibited weapon (a switchblade knife), a class A misdemeanor. *See* Tex. Penal Code § 46.05(a), (e). The jury assessed punishment at zero days confinement in the Williamson County Jail and a $500 fine. In three issues, appellant contends that (1) the trial court erred by denying her motion to suppress; (2) the evidence is legally insufficient to support the conviction; and (3) the trial court erred by refusing appellant's request for an article 38.23 jury instruction. *See* Tex. Code Crim. Proc. art. 38.23. On the basis of her first argument, we will reverse the judgment of conviction and remand the cause to the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 10:30 a.m. on December 7, 2010, Texas Department of Public Safety Trooper Jason Ernst was engaged in traffic enforcement on Interstate 35 in Williamson

County.[1] Ernst stopped appellant for speeding while she was driving southbound on Interstate 35. According to Ernst, his radar detected appellant's car traveling at 84 m.p.h. in a 70 m.p.h. zone. After appellant pulled over on the highway shoulder, Ernst parked his patrol car behind her. Ernst walked to the passenger side window, which appellant lowered. Ernst testified that appellant was sitting in the car wearing only a bra and pants, which he considered unusual behavior. Ernst also testified that appellant's facial expression was "a little alarming" and that appellant did not seem to understand why she was being pulled over. Appellant said she would "put on a shirt real quick." Ernst identified himself to appellant as a highway patrol officer and told her the speed limit was 70 m.p.h. and that her speed had exceeded that. Ernst asked appellant for her driver's license and asked her how fast she was going. Appellant stated that she did not have her driver's license with her, after which Ernst asked her to put on a shirt or jacket and step out of the car. Ernst testified that he often asks people who do not produce a driver's license to step out of the car.

Appellant and Ernst then stood behind and to the side of appellant's car. Ernst asked appellant where she was coming from, to which she answered, "Killeen." Ernst asked appellant if that is where she lived, to which she responded that she did not but her friends did. Ernst then told appellant that he needed to get some information from her and asked her if she knew her driver's license number. Appellant stated that she did not but that she could provide her social security

---

[1] The facts related herein derive primarily from the evidence presented at the hearing on appellant's motion to suppress, which consisted of the testimony of Ernst and Terry Parker, a Trooper and K-9 handler with the Texas Department of Public Safety, and a videotape of Ernst's traffic stop of appellant.

number. Then, responding to Ernst's questions, appellant provided her first and last name, her date of birth, and her address. She also gave Ernst her proof of automobile insurance.

At that point, which was approximately two minutes after he first identified himself to appellant, Ernst asked her where she was going. Appellant replied that she was going home to pick up her daughter. Appellant confirmed that she had spent the night in Killeen. Ernst then asked her what she had done the night before, and appellant responded that she had not really done anything. Appellant explained that she had gone to visit a friend who she thought was in jail in Bell County, but that he had been transferred to Dallas, so she was returning to Austin to pick up her child at the child's father's house so that he could go to work. At the hearing on the motion to suppress, Ernst testified that he found appellant's explanation unclear and that it did not make sense to him that someone who was traveling northbound on I-35 to visit a friend would go back the next day. Ernst also testified that he did not understand why appellant had left her child with the father rather than bringing it with her.

Ernst then examined the proof of insurance while appellant stated that her parents were paying for her automobile insurance at the time. Ernst asked appellant if she had a driver's license, and appellant stated that she did have a license but it was not with her. Ernst then asked appellant if anything was going to "pop up" when he ran her driver's license, to which she responded that she had a clean record except for something she did as a "youngster." Ernst walked to the front of appellant's car and appeared to look at the registration sticker on the front windshield.

Ernst then returned to where appellant was standing and asked her what kind of work she did. Appellant responded that she was a tattoo artist and provided the name of her place of

3

employment.  Responding to Ernst's question, appellant stated that business was really slow.  Ernst then informed appellant that she was traveling at 84 m.p.h.  Appellant disputed that she was going that fast and informed Ernst that she had gotten a speeding ticket the previous day.  Ernst told appellant to stay where she was and that he was going to check her driver's license.  At that point, appellant's cell phone rang, and Ernst told her not to answer it.  Appellant explained that she was turning the ringer off.  Ernst then walked back to his patrol car.

At the suppression hearing, Ernst testified that he found appellant to be nervous and that she would not look him in the eye when he was asking direct questions.  Ernst also testified that appellant asked numerous questions about why she was being stopped and that he noticed she was twitching her feet while he asked questions.  Ernst stated that these behaviors were outside of the usual routine traffic stop.  Ernst testified that while he expects some type of nervousness in a person who has been stopped by law enforcement, he would not expect it to the degree he observed in appellant.  Ernst also testified that he did not believe appellant turned around to watch him while he went back to check the registration on her vehicle and that was "an indicator . . . that something didn't seem right about that."  Ernst testified that he had observed these types of behaviors in other traffic stops where narcotics and weapons were found.  When asked whether appellant seemed "extremely nervous," Ernst responded that "nervous is nervous," but that he did not observe any pounding pulse or any sweat and that appellant was not evasive in answering his questions.  Ernst testified that appellant was forthcoming but that he was confused by her explanation of her coming and going to Killeen.

4

While Ernst was in his patrol car, and approximately five minutes after Ernst first identified himself to appellant, a computerized voice can be heard to state that appellant's status is "clear." Approximately two and a half minutes later Ernst got out of his patrol car, walked over to appellant and asked her the name of the person she went to visit in jail. Appellant gave him the name and, responding to Ernst's questions, explained that she knew him because he was also a tattoo artist. She related that her friend had turned himself in to law enforcement because he found out there were outstanding warrants for his arrest for failure to pay child support. Ernst then asked appellant where this person was, to which she replied that he was in Dallas now because he had been transferred there. Ernst then asked appellant if she had gone to Dallas to see him. Appellant replied in the negative and explained again that her friend had been in Harker Heights (near Killeen), had turned himself in to authorities in Belton, and had been transferred to Dallas.

Ernst then asked her if the car she was driving belonged to her, which she confirmed. Ernst then asked appellant if there was anything in the car "he needs to know about," such as any illegal guns, knives, or narcotics. Appellant shook her head no. Ernst then asked appellant if she had smoked marijuana, to which she responded no. Ernst then asked appellant if she had *ever* smoked marijuana, to which she responded that she had when she was younger. Ernst then asked appellant if anyone had smoked marijuana in the car, to which appellant shook her head no, and added that she smoked cigarettes but had run out. At that point, Ernst asked appellant if she would mind if he searched her vehicle. Appellant replied that she did not want him to. Ernst asked her why not, to which she replied that it was her "right." Ernst told appellant that he had asked her if there was anything in the vehicle and that she had said there was not. Appellant responded that it was her

5

right not to consent to the search and that she felt like she was being berated for nothing. Ernst confirmed that it was appellant's right not to give her consent to the search. Appellant then said that she did not think she was speeding but that she might have been going five to six miles over the speed limit. Ernst then told appellant the reasons he had for asking to search the vehicle, which were: (1) her high rate of speed; (2) she was acting nervous; (3) that, although there was nothing wrong with it, she was driving her car wearing only a bra and pants; and (4) she did not have her driver's license with her. Ernst stated that those were the reasons he was asking her if there was anything in the vehicle he "need[ed] to know about." Appellant repeated that there was not. Ernst then asked appellant again if she objected to his "taking a look at her vehicle," to which appellant responded that it was her right to say no. Ernst then asked if appellant was telling him he could not search her vehicle, and appellant again confirmed that she was exercising her right to refuse to give her consent to the search. Ernst said "okay" and returned to the patrol car.

At the hearing on the motion to suppress, Ernst explained that the totality of the circumstances, including appellant's high rate of speed, the fact that she was driving a car while wearing only a bra and pants and did not produce a driver's license, the confusing nature of her story regarding where she was coming from, and the fact that she had gotten a speeding ticket the day before, led him to ask for her consent to search her vehicle. Ernst testified that "things were very suspicious," and that he had a reasonable suspicion that there was "maybe, possibly something in the car." Ernst testified that he did not detect any odor of marijuana, that appellant's eyes were not bloodshot, and that he did not observe any signs of current or recent drug use.

At that point, which was approximately 11 minutes after he first identified himself to appellant, Ernst got on his radio and requested that another officer join him. He also began asking over the radio for a K-9 unit to come to the scene. Ernst got out of the car and told appellant that he was asking for a K-9 unit to come. He stated to her, "That's why we're waiting." Ernst returned to his patrol car, after which there followed more discussion over the radio about the availability of a K-9 unit. After a minute or so, a K-9 unit officer responded that he was nearby and could be there in 15 minutes. Ernst then got out of the patrol car, approached appellant, and told her that the K-9 unit was en route and would be there in 10 minutes.

Ernst then returned to his car where he began talking to a second officer who had by then arrived at the scene. Ernst told the officer that a K-9 unit was on the way and explained that appellant had been driving the car in her bra, was nervous and fidgety, and did not have her driver's license with her. Ernst told the officer that appellant had refused to give him consent to search the vehicle. The officer asked Ernst if appellant "had a history," and Ernst responded that there was "nothing." The officer asked Ernst if he had asked appellant where she stayed the night before, to which Ernst responded: "No, she would have no clue." Ernst then stated that appellant was "nice" at first but that her attitude changed when he asked to search her car and told him that it was her right not to give him her consent. Ernst recounted the conversation he had had with appellant regarding why he wanted to search her car, to which the other officer responded that they would just have to wait and see "how good" the K-9 unit was and stated, "We'll see what happens." The officer added that if anyone had smoked anytime within the last two weeks in or around the vehicle, the dog would alert.

7

The two officers continued to talk in the patrol car about unrelated topics until appellant, who was still standing beside her car, signaled to Ernst. Ernst got out of the patrol car and approached appellant, who asked if she could call someone to tell them she would be late. Ernst told appellant he could not let her use her cell phone. Appellant then stated that she needed to pick up her child, to which Ernst responded she would have plenty of time to make it to her destination by the time she needed to be there. Ernst returned to the patrol car, and he and the other officer resumed their conversation about unrelated topics. At one point, Ernst remarked that appellant had gotten stopped for speeding the previous day going northbound on I-35. Ernst then got out of the patrol car and asked appellant where she stayed the night before. Appellant responded that she stayed at her friend's house in Harker Heights off a street called Indian Trail. Ernst asked appellant how she knew the friend, and appellant stated that the friend was the girlfriend of the friend she had tried to visit in jail. At that point, which was approximately 33 minutes after Ernst first identified himself to appellant and approximately 15 minutes after he informed appellant that the reason they were waiting was because he had called a K-9 unit, Trooper Terry Parker and his canine partner Hannon arrived at the scene.

After Parker arrived, he informed appellant that he was there to have Hannon do a "free-air" search of her vehicle. Ernst testified that after conducting the search, Parker told him that Hannon had alerted on the vehicle. Ernst then searched the inside of the vehicle where he found marijuana seeds by the driver's side door and in the driver's seat and marijuana "shake"[2] on the driver's side floorboard. Ernst continued his search of the vehicle. Inside a purse on the passenger's

---

[2] Ernst testified that the term "shake" refers to the residue from ground marijuana.

8

seat Ernst found a "butterfly knife" (considered a type of switchblade). Ernst placed the knife on the hood of the car and continued his search. When he had completed the search, Ernst arrested appellant for possession of a prohibited weapon.[3] A jury convicted appellant of that offense, and she perfected this appeal.

## STANDARD OF REVIEW

"In reviewing a trial court's ruling on a motion to suppress, appellate courts must afford great deference to the trial court's findings of historical fact as long as the record supports those findings." *Tucker v. State*, 369 S.W.3d 179, 184 (Tex. Crim. App. 2012). We apply a bifurcated standard of review, giving almost total deference to the trial court's findings of historical fact and reviewing de novo the trial court's application of the law of search and seizure. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When the trial court does not make explicit findings of historical facts, we review the evidence in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327. "In other words, we will assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion." *Id.* We will reverse the trial court's suppression decision only if it is unsupported by the record and therefore constitutes an abuse of discretion. *Upton v. State*, 853 S.W.2d 548, 552 (Tex. Crim. App. 1993).

In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based

---

[3] Appellant was not charged with possession of marijuana, presumably because a "usable quantity" was not found. *See* Tex. Health & Safety Code § 481.121(a).

on that evidence rather than evidence introduced later at trial. *Rachal v. State*, 917 S.W.2d 799, 800 (Tex. Crim. App. 1996). Appellate review may include evidence adduced at trial, however, when "the suppression issue has been consensually re-litigated by the parties during trial on the merits." *Id.* at 809. In the present case, since appellant did not object at trial when the State introduced evidence relevant only to the suppression issue, and in fact appellant's counsel asked Ernst a question germane to that issue, we may properly consider Ernst's trial testimony in our review of the trial court's suppression determination.[4]

Although the trial court's findings are afforded almost total deference, when evidence is conclusive, such as "indisputable visual evidence," any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) (quoting *Tucker*, 369 S.W.3d at 184 (Alcala, J., concurring)). Thus, when a videotape presents indisputable evidence contradicting essential portions of an officer's testimony, that testimony cannot support a trial court's finding even though the officer's testimony might, by itself, be read to support the finding. *See Carmouche*, 10 S.W.3d at 332. "If the video evidence does not support the trial court's conclusion, then the court of appeals should reverse." *Tucker*, 369 S.W.3d at 185.

---

[4] We observe that Ernst's trial testimony, though less detailed, was not materially different from or inconsistent with his testimony at the suppression hearing.

## DISCUSSION

In her first issue, appellant contends that the trial court erred by denying her motion to suppress and admitting evidence obtained by Ernst during his search of her vehicle. Appellant contends that although Ernst's initial detention of her was proper, the detention was unreasonably extended, rendering the search of her vehicle improper.[5] *See Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997) (search that is reasonable at its inception may violate Fourth Amendment by virtue of its excessive intensity and scope). The issue presented, then, is whether Ernst's detention of appellant until the arrival of the K-9 unit was constitutionally "reasonable" under the totality of the circumstances.

An investigative stop may last no longer than necessary to effectuate its purpose. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). In the present case, Ernst testified that he pulled appellant over because she was traveling in excess of the posted speed limit—i.e., he stopped appellant for a traffic violation. The purpose of the stop, therefore, was to investigate the traffic violation and issue either a warning or citation for speeding. During the investigation, Ernst had the right to request a driver's license, insurance papers, information on the ownership of the vehicle, the driver's destination, and the purpose of the trip. *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd). A routine traffic stop also authorizes a license and warrants check. *Kothe*, 152 S.W.3d at 63. The officer may request certain information from the

---

[5] Appellant also contends that Hannon's ability to detect narcotics was unreliable and consequently the free-air alert did not give rise to probable cause for Ernst to search her vehicle. *See generally Florida v. Harris*, 133 S. Ct. 1050 (2013) (discussing reliability of narcotics dog as factor in probable-cause determination). Because we conclude that Ernst's detention of appellant until Hannon arrived was not reasonable, we need not address this argument.

driver, including her driver's license and car registration, and may conduct a computer check of that information. *Id.* "It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved." *Id.* When the traffic-stop investigation is completed, the detention must end and the driver be permitted to leave. *Id.* Continued detention is justified only if the officer has developed reasonable suspicion that the detainee is or will be engaged in criminal activity. *Davis*, 947 S.W.2d at 243-33; *McQuarters v. State*, 58 S.W.3d 250, 256 (Tex. App.—Fort Worth 2001, pet. ref'd).

In the present case, the State first contends that Ernst's detention of appellant until the arrival of the canine unit was reasonable because Ernst had not yet effectuated the purpose of the traffic stop. The State asserts that appellant was not detained for a longer period than was necessary to accomplish the purpose of the traffic stop, and therefore Ernst need not have developed a reasonable suspicion that appellant was engaged in criminal activity. We disagree. While investigating a traffic stop, an officer is required to diligently pursue a means of investigation that is likely to accomplish the purpose of the stop expeditiously. *See United States v. Sharpe*, 470 U.S. 657, 686 (1985). Ernst conducted his investigation pertaining to the traffic stop in a diligent and expeditious manner, verifying after only five minutes that appellant had a valid driver's license and a clean record with no warrants.[6] By that time Ernst had also examined appellant's insurance papers

---

[6] Although Ernst could have arrested appellant for failing to have her driver's license in her possession, *see* Tex. Transp. Code § 521.025(a), (c), he chose not to do so, opting instead to conduct a computer search to determine if appellant had a valid license. After determining that she did, no more was made of that issue. *See id.* § 521.025(d). Moreover, we consider the time it took Ernst

12

and questioned her regarding the purpose of her trip. He had informed appellant that he had recorded her speed at 14 miles over the speed limit. Ernst's investigation of the traffic violation was, for all intents and purposes, completed no later than 8 minutes after he had identified himself to appellant. Instead of issuing a warning or citation, however, Ernst then began questioning appellant regarding whether there was anything illegal in her car, asked her twice for consent to search her vehicle, explained his reasons for his request to search her vehicle, and summoned a K-9 unit to the scene to conduct an open-air sniff of the vehicle. Indeed, 8 minutes after first asking for consent to search appellant's vehicle, Ernst informed her that he had called for a K-9 unit, stating, "That's why we are waiting." It is evident that Ernst had ceased his investigation of the traffic violation for which he first stopped appellant at least 15 minutes before the K-9 unit arrived.

Nevertheless, the State argues that Ernst had not completed his investigation of the traffic violation because he had not yet issued appellant a citation for speeding. While it is true that courts generally hold that the purpose of an investigative traffic stop is fully effectuated when an officer writes a citation or warning, it is not necessarily the case that the converse is true. In other words, an officer may not prolong or extend the reasonable period of time necessary to accomplish the purpose of the traffic stop merely by delaying his issuance of a citation or warning. Ernst had conducted his investigation of the traffic violation and had the information necessary to issue either a warning or citation long before the arrival of the K-9 unit. The mere fact that he did not actually issue the citation but instead turned his attention to summoning and waiting for a K-9 unit to arrive

---

to verify the existence of appellant's license as being included in the reasonable length of her detention.

13

does not, as the State urges, demonstrate that the purpose of the stop had not been effectuated.[7] At the point in time that Ernst had concluded his investigation of the speeding offense, he could have written any necessary citations or warnings to appellant, her detention would have ended, and she would have been permitted to leave. *See Kothe*, 152 S.W.3d at 63-64. Ernst must have *at that point* had reasonable suspicion that appellant was engaged in criminal activity in order to detain her until the K-9 unit arrived. *See id.*; *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd) (if consent to search vehicle is refused after purpose of traffic stop has been accomplished, officer must have reasonable suspicion to continue to detain person stopped).

We next consider whether, at the time he had completed his investigation of the traffic violation, Ernst had reasonable suspicion to continue to detain appellant. "Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005) (citing *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)); *Carmouche*, 10 S.W.3d at 328-29 (reasonable suspicion permits officer to detain person on less than probable cause for purpose of investigating possible criminal behavior when officer points to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant detention). The standard is an objective one that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Ford*, 158 S.W.3d

---

[7] During that waiting period, there is no evidence that Ernst made any attempt to write appellant a citation for speeding. He did not issue appellant a traffic citation until that evening, approximately two hours after she had been booked into jail.

14

at 492. In order for the detention to be proper, Ernst's stated reasons for doing so must objectively support a reasonable suspicion that appellant was, had been, or soon would be engaged in criminal activity. *See Davis*, 947 S.W.2d at 244.

> "Reasonable suspicion" exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity. This standard is an objective one: there need only be an objective basis for the stop; the subjective intent of the officer conducting the stop is irrelevant. The reasonable suspicion determination is made by considering the totality of the circumstances.

*Garcia*, 43 S.W.3d at 530. In determining whether the totality of the circumstances supports the reasonable-suspicion finding, we give almost total deference to the trial court's determination as to what the actual facts are, and we then review de novo whether those facts are sufficient to give rise to a reasonable suspicion. *Id.*

At the suppression hearing and at trial, Ernst listed the facts that he relied on in deciding to detain appellant until the K-9 unit arrived:

(1) appellant was traveling at a high rate of speed;

(2) appellant was driving her car wearing only a bra and pants;

(3) appellant appeared nervous and did not make eye contact;

(4) appellant did not produce her driver's license when asked;

(5) appellant gave a confusing response to his questions regarding the purpose of her trip; and

(6) appellant had gotten a speeding ticket the day before.

15

Ernst also testified, however, that appellant was not evasive or deceitful in her responses to his questions, but was forthcoming and responsive. Ernst testified that although appellant appeared nervous, he did not observe her to have been sweating or have a pounding pulse. Ernst also testified that he did not detect any odor of marijuana or any signs that appellant had recently used any drugs and that appellant's eyes were not bloodshot. Nevertheless, Ernst testified that "by the totality of everything . . . things were very suspicious. A reasonable suspicion that there was maybe, possibly something in the car for me to ask [for consent to search the vehicle]."

The State relies heavily on Ernst's testimony that appellant's description of the purpose for her trip was confusing and made no sense to him, presumably leading to an inference that she was hiding the true nature of her travels, which could lead to the further inference that appellant was really engaged in transporting drugs. *See, e.g.*, *Vasquez v. State*, 324 S.W.3d 912, 917 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (reasonable suspicion created in part by detainee's implausible story about purpose for his travel). In its brief, the State asserts that appellant

> proceeded in telling a rambling, confusing story to Ernst regarding where she was going and from were she was coming. The story included Appellant having been pulled over the day before, on the same roadway, for the same offense, and included Appellant driving over-night to visit a friend of hers in jail, a friend who she could not name and who Appellant later claimed, in the same story, turned out not to be at the jail.

Having carefully reviewed the videotape, we observe that the State's description of the exchange between Ernst and appellant regarding these matters is, in significant respects, inaccurate. Appellant's answers to Ernst's questions regarding her activities in the preceding 24 hours were neither rambling nor confused. Appellant told Ernst that she had driven to Killeen to visit a friend

16

named Stacey who had turned himself in to authorities in Belton after learning there was a warrant for his arrest for failure to pay child support. Appellant explained that when she went to the jail to see Stacey, she learned that he had already been transferred to Dallas and she was therefore unable to visit him. Appellant related that she then spent the night at Stacey's girlfriend's house, located off of Indian Trail in Killeen, and was returning home to Austin to pick up her child, who was being cared for by the child's father. Appellant explained that she needed to get there in time to pick the child up before the father had to leave for work. Appellant also told Ernst that she had gotten a speeding ticket the day before on her way to Killeen. The fact that Ernst may have misunderstood appellant's explanation of her travels or found it confusing does not make it so. Rather, appellant's explanation of her trip from Austin to Killeen and back was consistent and cogent and does not provide an objective basis for inferring that appellant was engaged in criminal activity.

The remainder of the factors Ernst relied on to form reasonable suspicion do not, considered individually or together, provide more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Nor do they support drawing any specific reasonable inferences that appellant was transporting drugs. The facts that appellant was nervous when pulled over and questioned by a law enforcement officer, was not able to produce her driver's license, and was oddly attired do not support a specific reasonable inference that appellant had been, was, or soon would be engaged in criminal activity. *But cf. Davis*, 947 S.W.2d at 243 n.3 (courts give due deference to specific reasonable inferences officer is entitled to draw from facts in light of experience).

17

Reasonable suspicion requires suspicion by the officer that (1) some activity out of the ordinary is occurring or has occurred, (2) some suggestion to connect the detained person to the unusual activity, and (3) some indication that the activity is related to a crime. *Gurrola v. State*, 877 S.W.2d 300, 302 (Tex. Crim. App. 1994). "At a minimum, the suspicious conduct relied upon by law enforcement officers must be sufficiently distinguishable from that of innocent people under the same circumstance as to clearly, if not conclusively, set the suspect apart from them." *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)). Appellant's conduct, as evidenced by the videotape and described in Ernst's testimony, simply does not meet that standard.

Ernst testified that it is not unusual for people to be nervous when pulled over by law enforcement officers, nor is it unusual for a driver not to have her driver's license. Although Ernst testified that appellant seemed "more nervous" than the usual detainee, that statement does not find support in the videotape. Moreover, the court of criminal appeals has held that nervousness alone is not enough to amount to reasonable suspicion. *St. George v. State*, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007). The fact that appellant was not wearing a shirt over her bra may have seemed odd to Ernst, but that is not the issue. Rather, appellant's appearance and demeanor must have been indicative of some criminal activity, not merely of eccentricity. *Crockett*, 803 S.W.2d 308. The court of criminal appeals has rejected general attire as a relevant ground for police to detain or arrest. *See Davis*, 947 S.W.2d at 247-48 (Mansfield, J., concurring) ("This Court has previously rejected attire as a ground for police to 'stop and frisk' an individual.") (citing *Baker v. State*, 478 S.W.2d 445, 449 (Tex. Crim. App. 1972) ("The fact that appellant was barefooted, had long

18

hair, and was shabbily dressed does not constitute probable cause to arrest. . . . Nor do the overall circumstances presented furnish the state with a valid 'stop and frisk' situation.")). Moreover, Ernst did not articulate how or why appellant's attire gave rise to an objectively reasonable suspicion that she possessed drugs. In sum, Ernst had nothing more than an inchoate and unparticularized suspicion or "hunch" that something illegal might be in appellant's car because she was nervous, had been oddly attired when stopped, and had repeatedly declined to give him consent to search the vehicle. Nevertheless, rather than issuing a warning or citation and permitting appellant to leave, Ernst called dispatch and requested that a K-9 unit be sent to the scene. Appellant's continued detention to await the arrival of the K-9 unit after the completion of the traffic stop investigation, absent reasonable suspicion of criminal activity, violated her Fourth Amendment rights. *See Kothe*, 152 S.W.3d at 63-64; *Davis*, 947 S.W.2d at 244-45; *Garza v. State*, No. 13-12-00240-CR, 2013 WL 3378325, at *9-10 (Tex. App.—Corpus Christi July 3, 2012, no pet.) (mem. op., not designated for publication). We conclude that the trial court abused its discretion by misapplying the law to the undisputed facts as reflected in the videotape and Ernst's testimony. *See McQuarters*, 58 S.W.3d at 258. Consequently, we sustain appellant's first issue and hold that the trial court erred in denying appellant's motion to suppress.

In appellant's second issue, she challenges the legal sufficiency of the evidence to support her conviction. She argues that the State failed to establish that the knife in question was a "knife" as defined in section 46.01(7) of the Texas Penal Code. *See* Tex. Penal Code § 46.01(7).[8]

---

[8] In her brief, appellant also states that the State failed to establish "any intent of Appellant by direct or circumstantial evidence." Because appellant's brief does not contain any further argument or elaboration with regard to this contention, we need not address it. *See* Tex. R. App. P.

19

We address this point because appellant would be entitled to an acquittal if her complaint were sustained. *See Ortiz v. State*, 577 S.W.2d 246, 259 (Tex. Crim. App. 1979).

In reviewing the legal sufficiency of the evidence, we consider all the evidence in the record, both direct and circumstantial, properly or improperly admitted evidence, and evidence submitted by either the prosecution or the defense. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State*, 131 S.W.3d 485, 489-90 (Tex. Crim. App. 2004). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *see Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). In assessing legal sufficiency of the evidence, we have a duty to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010).

Appellant contends that the State failed to introduce evidence that the butterfly knife in her possession was "capable of inflicting serious bodily injury or death by cutting or stabbing a person with the instrument." *See* Tex. Penal Code § 46.01(7) (statutory definition of "knife"). We disagree. In his testimony, Ernst identified the knife he had found in appellant's car and testified that it had a serrated edge. The knife was admitted into evidence, and the jury was permitted to take it

_____

38.1(i) (brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to record). To the extent appellant is challenging the sufficiency of the evidence that she intentionally possessed the butterfly knife, we observe that it was found in a bag belonging to her that was in her car and that she testified that she purchased the knife at a yard sale on her way home from Killeen, intending to add it to her collection of butterfly knives.

20

to the jury room and examine it. Consequently, testimony that the knife was capable of inflicting serious bodily injury or death was not required. *See Robertson v. State*, 163 S.W.3d 730, 731, 734 (Tex. Crim. App. 2005) ("testimony describing the switchblade knife" not necessary to support deadly weapon finding because knife was introduced into evidence and fact-finder "had the opportunity to examine the weapon and ascertain for itself whether the weapon had physical characteristics that revealed its deadly nature"); *Estrada v. State*, 334 S.W.3d 57, 62 (Tex. App.—Dallas 2009, no pet.) (same). A rational trier of fact could have found beyond a reasonable doubt that the knife, with its serrated edge, was capable of inflicting serious bodily harm. We overrule appellant's second issue.

## CONCLUSION

Having concluded that the trial court erred by denying appellant's motion to suppress evidence obtained during the search of her vehicle, we sustain appellant's first issue, reverse the trial court's judgment of conviction, and remand the cause to the trial court for further proceedings consistent with this opinion.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field

Reversed and Remanded

Filed: July 31, 2013

Publish

21