# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00153-CR

**The State of Texas, Appellant**

**v.**

**Frances Anita Robinson, Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
NO. CR2013-267, HONORABLE R. BRUCE BOYER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Following a fatal automobile accident, appellee Frances Anita Robinson was transported to a hospital, where her blood was drawn without a warrant pursuant to section 724.012(b) of the Texas Transportation Code, commonly known as the mandatory-blood-draw statute.[1] Robinson was subsequently charged with the offense of intoxication manslaughter.[2] Prior to trial, Robinson filed a motion to suppress evidence relating to the results of the blood draw, which the district court granted following a hearing. In a single issue on appeal, the State asserts that the district court abused its discretion in doing so. Guided by decisions that the Texas Court of Criminal Appeals has issued since the district court's order, we will reverse the order and remand for further proceedings consistent with this opinion.

---

[1] *See* Tex. Transp. Code § 724.012(b).

[2] *See* Tex. Penal Code § 49.08.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for abuse of discretion.[3] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[4] "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case."[5]

Additionally, "[w]e review a trial judge's ruling on a motion to suppress under a bifurcated standard of review."[6] First, we are to "afford almost total deference to a trial judge's determination of historical facts," as "[t]he judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony."[7] Therefore, "[w]hen the trial judge makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them, regardless of whether the motion to suppress was granted or denied."[8] "Second, we

---

[3] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[4] *Id*. (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g).

[5] *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

[6] *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016) (citing *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013)).

[7] *Id*. (citing *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010)).

[8] *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011) (citing *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

review a judge's application of the law to the facts de novo."[9]  In this case, we review de novo the trial court's application of the law of search and seizure to the facts.[10]

## EVIDENCE

The sole evidence presented at the hearing on the motion to suppress was the testimony of Department of Public Safety Trooper Richard Alvarez, whom the district court would later find "credible" and that "the facts were as [he] believed them to be."

Alvarez testified that on March 11, 2012, at approximately 1:04 a.m., he was dispatched to the scene of a single-car accident that had occurred in a "populated subdivision" located in Canyon Lake.  Alvarez testified that when he arrived at the scene, approximately seven minutes later, a vehicle was "flipped over on its top on the side of the road," and the driver of the vehicle, later identified as Robinson, was "still being extracted out" of the vehicle.  Alvarez recounted that Robinson was "behind the wheel" and "upside down," and firefighters were "slowly getting her out."  Alvarez added, "[T]hey were suspecting possible neck injuries and back injury" to Robinson.  Alvarez also testified that the body of a "deceased male," later identified as Robinson's fiancé, was lying next to the vehicle.

---

[9] *Cole*, 490 S.W.3d at 922.

[10] *See Valtierra*, 310 S.W.3d at 447; *Thompson v. State*, 408 S.W.3d 614, 621 (Tex. App.—Austin 2013, no pet.); *see also State v. Villarreal*, 475 S.W.3d 784, 798 (Tex. Crim. App. 2014) ("[B]ecause the facts are undisputed and the questions before us are matters of law, we apply a de novo standard of review."); *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004) ("On appeal, the question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to de novo review.  Despite its fact-sensitive analysis, 'reasonableness' is ultimately a question of substantive Fourth Amendment law.").

3

According to Alvarez, there were already "deputies . . . at the scene" when he arrived, including Deputy Dustin Savage of the Comal County Sheriff's Office, and another DPS trooper, Kenny Mata, arrived at the scene approximately fifteen minutes after Alvarez. Alvarez explained that Savage had assisted him during the investigation by "protect[ing] the scene," "directing traffic," and gathering information regarding the deceased's next of kin, while Mata assisted Alvarez by obtaining videotaped statements from witnesses at the scene who had observed the crash. Alvarez, who was the lead investigator in the case, attempted to reconstruct how the accident had occurred by examining the physical evidence at the scene. Alvarez described this process as follows:

> I started photographing the scene and started marking the scene with fluorescent paint as to where—everything that appears to be evidence. I mark it. And, you know, I try to backtrack—at the final resting point, backtrack where the vehicle—the path it took before it crashed and—and eventually try to meet with the—with the driver and try to get their version of what happened.

When asked to explain why it was important for him to immediately mark the scene with paint, Alvarez testified,

> Well, in addition to fog, we're starting to get a light mist. There's things that I have to mark with the paint because, you know, evidence tends to naturally disappear the next day: skid marks, shadow skids. If you don't videotape or—or take still photos that night, due to temperature adjustments, those shadow skids aren't going to be there the next day. . . . You get this done now because you may only have one chance. You know, the wreck is not going anywhere at that moment, but you need—you need to photograph it and—and preserve it, photograph it, document it, and then—because the next day, it may not be there.

Alvarez added, "[T]his is, for all practical purposes, a crime scene." Alvarez also testified that the deputies who were on the scene had not been trained in accident reconstruction and thus could not assist him with that task.

4

Alvarez further testified that, as part of his investigation, he had interviewed Robinson after she had been removed from the vehicle and carried by stretcher into an ambulance. According to Alvarez, during the conversation, he observed that Robinson had "glassy, bloodshot eyes" and a "strong odor of alcohol coming from her breath." Additionally, Alvarez testified, Robinson had admitted to him that "she had a drink . . . earlier in the evening." Alvarez recounted that as he attempted to get more information from Robinson regarding the accident, he was interrupted by EMS personnel, who "were suspecting a lot of internal injuries on her, and they had to get her out of there." Robinson was subsequently transported by ambulance to a hospital in San Antonio that Alvarez estimated was approximately 38 to 40 miles away from the accident's location.

Meanwhile, Alvarez recounted, he remained at the scene of the accident to complete his investigation. Alvarez testified that his investigation took approximately 30 minutes to complete, but he remained on the scene for "about two-and-a-half hours, maybe three," while he waited for "the funeral home and the justice of the peace" to arrive and tend to the body, and a tow truck to arrive and clear the vehicle from the scene.

Alvarez further testified that, after completing his investigation, he had perceived reasons to believe that Robinson had committed the offense of intoxication manslaughter and decided to obtain a sample of her blood. To do so, Alvarez recounted, he called DPS and had them dispatch a San Antonio trooper, Rodney Zarate, to the hospital to draw Robinson's blood. Alvarez testified that he instructed Zarate to ask for Robinson's consent but, if she refused, to obtain her blood pursuant to the provisions of the mandatory-blood-draw statute.[11] Alvarez testified that he

---

[11] *See* Tex. Transp. Code § 724.012(b).

5

decided to rely on the statute, rather than a warrant, to obtain the blood sample because "time [was] of the essence." He explained:

> [T]he more time that goes on, the evidence becomes thinner. And, eventually, I'm going to lose that evidence. You know, her—as we're trained, you need to try to get to that defendant as soon as you can in order to obtain a blood sample, because the faster you get it, the more accurate reading you're going to get.

When asked if he could have stopped what he was doing to "go write up a search warrant," Alvarez testified that he could not. When asked if Trooper Mata could have assisted him with the warrant process, Alvarez testified, "No, sir. He was—he was busy with the witnesses. And at that point, I'm asking him for assistance with inventory, and also looking for information on the next of kin on the deceased." Alvarez added that Mata was "a fairly new trooper," and he did not know whether Mata was qualified to complete an affidavit for a blood search warrant. Alvarez similarly did not know whether Deputy Savage was qualified to complete a search-warrant affidavit. Alvarez also testified that he was the only officer on the scene who had sufficient information regarding how the accident had occurred to "draw up an affidavit for a judge to review." He explained:

> [F]or me to let another trooper call them up and say, Hey, I need a search warrant, well, he—that's hard to do because he does—he's not gathering the facts as I am, you know. So for him to draw up an affidavit for a judge to review, the judge has to see the proper probable cause reason for us to even request an evidentiary search warrant.

According to Alvarez, the other officers involved in the investigation did not have sufficient information regarding the offense: Mata "never really actually got to look at the vehicle"; Savage "didn't backtrack [the accident] as intense as [Alvarez] did"; and Zarate, who was in San Antonio, did not possess the same knowledge and facts as Alvarez did regarding the accident. Alvarez also

6

testified that he did not have time to stop what he was doing and inform the other officers of all the facts on which he was relying to inform his probable-cause determination that Robinson had committed the offense of intoxication manslaughter. He explained that, as the lead investigator, "I need to stick with that crime scene."

When asked how long it would have taken him to obtain a warrant after completing his investigation and clearing the scene, Alvarez testified,

> I really don't know how to answer that because—it would have taken quite some time because I would have to locate a judge—which I'm not using that as an excuse. But look at the weather, the—that was working against us that night: misting, heavy fog. It would have—if I'm having to guess, it would have been well—well up to three hours to be able to even meet with a judge. And—and I would have had to handwritten—handwrite up a search warrant. I can do that, but, you know, it would have been very difficult. It wouldn't have helped—the time and elements were really against us that night.

According to Alvarez, the three hours that he estimated it would take to complete the warrant process would have been in addition to the approximately three hours that had already elapsed since he had arrived at the scene of the accident. However, he later added that those additional three hours encompassed the entire process for obtaining a warrant, "[n]ot three hours to find a judge." Alvarez also testified that in this case, even without obtaining a warrant, Robinson's blood was not drawn until 4:40 a.m., which was over three-and-a-half hours after the accident had occurred.

On cross-examination, Alvarez acknowledged that there was a judge on call the night of the accident who could have been contacted for the purpose of signing a search warrant for Robinson's blood. However, Alvarez explained that because this case "involved a fatality," there were "other mitigating circumstances that tend to get in the way of quickly contacting a judge." Alvarez also acknowledged that the process of obtaining a warrant could be accomplished via fax

and that this process "could take 30 minutes" or "it could take up to an hour and a half," depending on the circumstances. Alvarez noted, however, that this estimate was based on cases "when the prisoner is with me in the car. I go to the hospital; I contact the judge." And Alvarez also testified that those cases in which he could obtain a warrant in 30 to 90 minutes did not include cases in which there had been a fatality. In those cases, Alvarez explained, "I'm going to be the last person to leave that crime scene . . . . And if there's going to be someone to get a warrant, that's going to have to be me."

Also on cross-examination, Alvarez acknowledged that there was a third DPS trooper who was briefly at the scene of the accident that night, Kurt McWhinney, who "showed up and then [] left" and "went back on patrol" because "there was not much he could do." When asked if he could have sent McWhinney "to get the search warrant or to assist [Alvarez] in getting a search warrant that night," Alvarez testified, "You know, there's a lot of things I could have done, but I didn't send him. I'm not in charge of him." Alvarez also testified that there was fourth trooper on duty that night, but "he was already at the jail . . . with [a] DWI driver."

At the conclusion of the hearing, the district court took the matter under advisement and later granted the motion to suppress. Upon request, the district court made findings of fact and conclusions of law, including the following:

> On March 11, 2012, at 1:04 a.m., Trooper Richard Alvarez was dispatched to a vehicle accident . . . in the Oaks Subdivision of Canyon Lake, Texas. He arrived at 1:11 a.m.
>
> There were a minimum of three officers at the scene.
>
> Due to suspected injuries, the Defendant was transported by EMS to University Hospital in San Antonio.

8

Trooper Alvarez was at the scene for 2 ½ to 3 hours.

Trooper Rodney Zarate was dispatched to the hospital where he obtained a warrantless, non-consensual blood draw from the Defendant.

Comal County implemented a "No Refusal Policy" for law enforcement in 2012, where a judge is on call for the purpose of obtaining blood-draw warrants.

Trooper Alvarez testified that as he was the scene investigator, he was the only officer who could have obtained a warrant.

Trooper Alvarez testified that he did not believe there were any other troopers available at the time of his investigation.

It generally takes 30-90 minutes to obtain a blood draw warrant by fax process in Comal County.

Trooper Alvarez was credible, and his testimony was likewise credible.

[T]he facts were as Trooper Alvarez believed them to be on the night of March 11, 2012.

Based on the above findings, the district court concluded that "the State did not demonstrate exigent circumstances upon which to perform a warrantless blood draw," and suppressed the blood-draw evidence on that ground. This appeal followed.

**ANALYSIS**

In its sole issue on appeal, the State asserts that the district court abused its discretion in granting Robinson's motion to suppress. Specifically, the State claims that the record does not support the district court's conclusion that the State failed to demonstrate exigent circumstances sufficient to justify the warrantless blood draw in this case.

"The Fourth Amendment provides in pertinent part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

9

shall not be violated, and no Warrants shall issue, but upon probable cause.'"[12] The drawing of a person's blood is considered a search and seizure under the Fourth Amendment.[13] Consequently, a blood draw generally requires a search warrant, unless a "recognized exception" to the warrant requirement applies.[14] "The established warrant-requirement exceptions are permitted because each is potentially reasonable and 'there is a compelling need for official action and no time to secure a warrant.'"[15]

"'One well-recognized exception,' and the one at issue in this case, 'applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'"[16] One such exigent circumstance is preventing the imminent destruction of evidence or contraband.[17] For intoxication-related offenses, the evidence that is at risk of destruction is a suspect's blood-alcohol content, which "begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system."[18] Consequently, in *Schmerber v. California*, the Supreme Court held that the warrantless collection of blood from a suspect does not violate the Fourth Amendment in cases "when the officer might reasonably have believed that he was confronted with an emergency, in which the delay

---

[12] *Cole*, 490 S.W.3d at 922 (quoting U.S. Const. amend. IV).

[13] *See Schmerber v. California*, 384 U.S. 757, 769 (1966).

[14] *See Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013); *Cole*, 490 S.W.3d at 922.

[15] *Cole*, 490 S.W.3d at 923 (quoting *McNeely*, 133 S. Ct. at 1559).

[16] *McNeely*, 133 S. Ct. at 1558 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

[17] *See Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007) (citing *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991)).

[18] *Schmerber*, 384 U.S. at 770.

necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"[19] In *Schmerber*, a DWI case, the Supreme Court concluded that there were exigent circumstances sufficient to justify a warrantless blood draw "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident."[20]

"Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances."[21] "An exigent circumstances analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search."[22] These facts include the officer's knowledge of "the body's natural metabolic process and the attendant evidence destruction over time," "the procedures in place for obtaining a warrant," "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence."[23]

Our analysis is further informed by two decisions that the Court of Criminal Appeals issued subsequent to the district court's ruling, each of which involves facts similar to those present here—one in which the court concluded that the State had failed to establish that a warrantless blood draw was justified by exigent circumstances, and one in which the court reached the opposite conclusion. First, in *Weems v. State*, a driving-while-intoxicated case, the defendant was in an

---

[19] *Id*. (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)).

[20] *Id*. at 770-71.

[21] *Cole*, 490 S.W.3d at 923 (citing *McNeely*, 133 S. Ct. at 1559).

[22] *Id*. (citing *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)).

[23] *McNeely*, 133 S. Ct. at 1568; *Cole*, 490 S.W.3d at 923.

automobile accident and proceeded to flee from the scene of the crash.[24]  Eventually, Weems was

found by a sheriff's deputy hiding underneath a parked car.[25]  Because Weems appeared to be

injured, EMS transported him to a hospital.[26]  The arresting officer followed the ambulance to the

hospital and, according to the officer, "it took only a 'couple of minutes' to get from the accident

scene to the hospital."[27]  Once the officer arrived at the hospital, he authorized a nurse to draw

Weems's blood without a warrant, and "Weems's blood was taken at 2:30 a.m., over two hours

after his arrest."[28]

"On review of the totality of the circumstances found in the record," the Court of

Criminal Appeals held that "Weems's warrantless blood draw was not justified by exigent

circumstances."[29]  The court first observed that there was some support in the record for a finding

of exigency, specifically the fact that Weems had fled the scene of the accident and hid from

law enforcement, which resulted in "forty minutes worth of alcohol dissipation."[30]  However,

according to the court, "little else in the record lends support to finding exigency in this case."[31]  For

example, the record suggested that a magistrate was "normally available to review" search-warrant

---

[24]  493 S.W.3d 574, 575 (Tex. Crim. App. 2016).

[25]  *Id*. at 576.

[26]  *Id*.

[27]  *Id*.

[28]  *Id*.

[29]  *Id*. at 580.

[30]  *Id*. at 580-81.

[31]  *Id*. at 581.

12

requests, even at the time Weems's blood was drawn.[32]  Also, the record did not reflect "what procedures, if any, existed for obtaining a warrant when an arrestee is taken to the hospital or whether [the arresting officer] could have reasonably obtained a warrant, and if so, how long that process would have taken."[33]  As a result, the court was "left with the inability to weigh the time and effort required to obtain a warrant against the circumstances that informed [the officer's] decision to order the warrantless blood draw."[34]  Additionally, because the officer testified that the hospital was only a "couple of minutes" away from the scene of the accident, "transporting Weems to the hospital did not necessarily make obtaining a warrant impractical or unduly delay the taking of Weems's blood to the extent that natural dissipation would significantly undermine a blood test's efficacy."[35]  Finally, the arresting officer "was not alone charged with both investigating the scene of the accident and escorting Weems to the hospital for treatment."[36]  There was another officer who had accompanied Weems and the arresting officer "throughout the investigation and while they were at the hospital waiting for Weems's blood to be drawn," and this other officer's "continued presence . . . militates against a finding that practical problems prevented the State from obtaining a warrant within a time frame that preserved the opportunity to obtain reliable evidence."[37]  "On this record," the court concluded, "the State [was] unable to demonstrate that practical problems existed in

---

[32] *Id*. at 581-82.

[33] *Id*. at 581.

[34] *Id*.

[35] *Id*. at 582.

[36] *Id*.

[37] *Id*.

obtaining a warrant 'within a timeframe that still preserved the opportunity to obtain reliable evidence" and thus had "failed to meet its burden and establish that exigen[t] circumstances existed to satisfy the Fourth Amendment's reasonableness standard."[38]

On the same day that it decided *Weems*, the Court of Criminal Appeals reached the opposite conclusion regarding the state of the record in *Cole v. State*, an intoxication-manslaughter case.[39] In *Cole*, the defendant "drove his large pickup truck 110 miles per hour down a city street in Longview," ran a red light at a "busy intersection," and collided with another vehicle, causing an explosion and instantly killing the driver of the other vehicle.[40] The first officer to arrive at the scene observed Cole trapped inside his vehicle as the fire approached it, and this officer was "able to remove Cole from his heavily damaged truck's driver's seat" only with the assistance of other officers.[41] Cole was subsequently interviewed at the scene by one of the responding officers, and during the interview, Cole admitted to her that he had taken "some meth" prior to the collision.[42] Cole was then transported by EMS to a hospital, where his blood was drawn without a warrant at 12:20 a.m., approximately two hours after the collision had occurred.[43]

At the time of the collision, "there was still considerable activity and traffic in the area of the accident," and the record reflected that multiple officers were needed at the scene to "secure

---

[38] *Id.*

[39] 490 S.W.3d 918, 919 (Tex. Crim. App. 2016).

[40] *Id.* at 919-20.

[41] *Id.* at 920.

[42] *Id.* at 920.

[43] *Id.* at 920-21.

the area," "keep[] people away for their own safety," and "block[] off several major intersections around the area."[44] Additionally, "the accident occurred around a shift change, when officers would be leaving evening shifts and others arriving for the late-night shift," which "further complicated satisfying the manpower needed to secure the scene, conduct an investigation, and maintain public safety."[45] "[A] significant number of officers" were needed at the scene because the accident's location "was in a large, busy downtown intersection" and "the accident investigation could become compromised if the area was not blocked off."[46] The lead investigator in the case, Officer Jeremy Higginbotham of the Longview Police Department, "spent approximately three hours investigating the scene of the accident," and the "entire accident scene was not cleaned up and cleared until 6:00 the following morning."[47]

Similar to Trooper Alvarez's testimony in this case, Officer Higginbotham testified that "there was no one else who could have determined the nature and cause of the accident or who was at fault."[48] Higginbotham also testified that, despite the availability of an on-call judge, "he was unable to leave the scene to go to the courthouse and speak to a prosecutor to secure a warrant for Cole's blood" because, according to Higginbotham, "the warrant process takes an hour to an hour-and-a-half 'at best,' and it was not feasible to wait until the accident investigation was

---

[44] *Id.* at 920.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 921.

15

entirely complete before securing a warrant."[49] Higginbotham also expressed concern that medical intervention and treatment "could affect the integrity of a blood sample," and he further asserted that "assign[ing] another officer at the scene the responsibility to obtain a warrant . . . would leave an essential duty unfulfilled."[50]

Although the intermediate court of appeals had concluded that the above evidence "failed to establish that an exigency existed to justify the warrantless search,"[51] the Court of Criminal Appeals disagreed. The court first observed that it was impermissible to "view[] law enforcement action through the lens of hindsight."[52] The court explained:

> Through reasoned deliberation free from tense, uncertain, and rapidly evolving circumstances, there is a tempting draw for a reviewing court to pronounce what law enforcement ideally should have done in a particular case after all the facts are known. But hindsight distorts a proper exigency analysis's focus: whether officers had a reasonable belief that obtaining a warrant was impractical based on the circumstances and information known at the time of the search. This approach also overlooks the practical problems and considerations found in the record that made obtaining a warrant impractical.[53]

These "practical problems and considerations," according to the court, included "the time required to complete the accident investigation"; "the lack of available law enforcement personnel"; "[t]he accident's severity"; the fact that only one officer "was capable of determining the nature or cause of the accident, or who was at fault," which made that officer's continued presence at the scene

---

[49] *Id.*

[50] *Id.*

[51] *Id.* at 922.

[52] *Id.* at 925.

[53] *Id.*

"vital"; "[t]he accident scene's location and the public-safety danger," which "required a number of officers at the scene to perform necessary responsibilities including securing the accident scene, directing traffic, and keeping the public away from the scene"; and the lack of "a readily available officer who could have gotten a warrant while Higginbotham continued his investigation." The court also observed that "[e]ven had Higginbotham attempted to secure a warrant from an on-call magistrate, the issuance of a warrant would have taken an hour to an hour and a half 'at best,'" during which time "both potential medical intervention performed at the hospital and the natural dissipation of methamphetamine in Cole's body would adversely affect the reliability of his blood sample."[54]

Based on its review of the totality of the above circumstances, the court concluded that "law enforcement reasonably believed that obtaining a warrant in this case would have significantly undermined the efficacy of searching Cole's blood" and, therefore, that "exigent circumstances justified Cole's warrantless blood draw."[55] According to the court, "law enforcement was confronted with not only the natural destruction of evidence through natural dissipation of intoxicating substances, but also with the logistical and practical constraints posed by a severe accident involving a death and the attendant duties this accident demanded."[56]

We reach the same conclusion on the facts of this case. As noted, the district court expressly found that Alvarez was credible and that "the facts were as Trooper Alvarez believed them to be." The totality of the circumstances here, as described by Trooper Alvarez, are similar to the

---

[54] *Id*. at 926.

[55] *Id*. at 927.

[56] *Id*.

17

circumstances described in *Cole*, including: a serious automobile accident that resulted in a fatality; an injured suspect who was transported to a hospital for treatment; a "crime scene" in a populated area that needed to be immediately protected, investigated, and subsequently cleaned and cleared; a lead investigator who knew that "time was of the essence" regarding the suspect's blood-alcohol content but who was unable to leave the scene of the accident to obtain a warrant until after his investigation and other duties as lead investigator were complete, which was approximately two-and-a-half to three hours after he had arrived at the scene; the limited availability of other officers who were present at the scene but who were fulfilling other law-enforcement duties and who did not possess the same information as the lead investigator regarding the probable-cause determination for a blood draw; and a warrant process that would take, at least, 30 to 90 minutes via fax, or, according to Trooper Alvarez, three hours if completed in person. Additionally, there were other circumstances present here that support a reasonable belief by law enforcement that obtaining a warrant would have been impractical, including that Robinson was transported to a hospital that was 38 to 40 miles away from the scene of the accident and that the weather was "misty" with "heavy fog," which might have delayed both Robinson's arrival at the hospital and the process of obtaining a warrant. Also, Alvarez testified that obtaining a warrant takes longer than usual when there is a fatality involved and he does not have custody of the suspect, which were the circumstances that were present here.

At the time of the district court's decision granting the motion to suppress, the district court did not have the benefit of the Court of Criminal Appeals's analysis in *Cole*, which we find to be dispositive. Under *Cole*, the totality of the circumstances to which Trooper Alvarez testified suffice to support a reasonable belief that obtaining a warrant in this case would have

18

significantly undermined the efficacy of searching Robinson's blood.[57] Accordingly, we conclude that the State satisfied its burden to prove that the warrantless blood draw in this case was justified by exigent circumstances, and the district court erred in concluding otherwise.[58]

We sustain the State's sole issue on appeal.

## CONCLUSION

We reverse the district court's order granting the motion to suppress and remand the case to the district court for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Pemberton and Bourland

Reversed and Remanded

Filed:  October 12, 2016

Do Not Publish

---

[57] *See Cole*, 490 S.W.3d at 927.

[58] *See Schmerber*, 384 U.S. at 770-71; *Cole*, 490 S.W.3d at 927; *see also State v. Keller*, No. 05-15-00919-CR, 2016 Tex. App. LEXIS 8796, at *13-16 (Tex. App.—Dallas Aug. 11, 2016, no pet. h.) (mem. op., not designated for publication).