# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00382-CR

**Keith Balkissoon, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
NO. 11-1434-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Keith Balkissoon of the felony offense of driving while intoxicated and assessed punishment at four and one-half years' imprisonment and a $10,000 fine.[1] The district court rendered judgment on the verdict, which included an affirmative finding that Balkissoon had used or exhibited a deadly weapon during the commission of the offense. In two issues on appeal, Balkissoon asserts that the district court abused its discretion in denying his motion to suppress evidence related to the results of a warrantless blood draw and that the evidence is insufficient to support the jury's deadly-weapon finding. We will modify the district court's judgment to delete the deadly-weapon finding and affirm the judgment as modified.

---

[1] *See* Tex. Penal Code §§ 49.04(a), 49.09(b)(2).

## BACKGROUND

At the hearing on the motion to suppress, the district court heard evidence that at approximately 2:00 a.m. on the night of October 7, 2011, Trooper Michael Reisen of the Texas Department of Public Safety had initiated a traffic stop on Balkissoon's vehicle after observing the vehicle "fail[] to yield [the] right of way out of a private drive" located along the access road of Highway 620 in Williamson County. During the course of the stop, Reisen explained, he concluded that Balkissoon had been driving while intoxicated and arrested him for that offense. Reisen subsequently asked Balkissoon for a sample of his breath or blood. According to Reisen, Balkissoon refused, and Reisen proceeded to have Balkissoon's blood drawn without his consent, based on Reisen's understanding that Balkissoon had two prior DWI convictions and that Texas law required Reisen to obtain a blood sample under those circumstances.[2] Reisen further testified that he "could have" obtained a search warrant for Balkissoon's blood but decided not to do so. When asked why he made this decision, Reisen testified that "[t]here was no need to. The law—the law was behind me taking the blood sample without a search warrant." Reisen added that it likely would have taken him "awhile" to obtain a warrant if he had decided to do so. He explained:

> It's a lengthy process because we have to book them in [to jail]; we have to do the paperwork; we have to e-mail the paperwork to a—we have to get a hold of a prosecutor; e-mail the paperwork to the prosecutor, who's got to e-mail it back to me. I've got to drive to the Judge's house; got to get him to read over it, sign it. Drive back to the jail; sign some paperwork to get him out of the jail to drive him to the hospital; wait at the hospital for a little bit in triage until a qualified technician comes down. They take the blood. I fill out the paperwork for the blood warrant, to seal it properly; put him back in my car, and get him back to the jail, and re-book him in.

---

[2] *See* Tex. Transp. Code § 724.012(b)(3)(B).

2

When asked to estimate how long the above process took, Reisen testified that, on one occasion, it took him approximately four hours.

Reisen also testified that "everything was prolonged" in this case because of what he characterized as Balkissoon's refusal to cooperate during the stop. For example, Reisen explained, Balkissoon refused to cooperate with Reisen regarding the disposal of Balkissoon's vehicle following his arrest. According to Reisen, the vehicle had to be either parked in a proper location, picked up by a friend, or towed, but Balkissoon "just would never answer the question." Eventually, Reisen testified, he had to "call[] a tow truck to pick it up."

Reisen further testified that he usually conducts DWI investigations without a partner and that during his investigations, personnel from "Williamson County may or may not come back me up." "But," Reisen added, "even if someone does come, it's my investigation. I do everything myself." Therefore, Reisen explained, when he needs to obtain a warrant, there is no one to help him complete the warrant paperwork and no other officer available to take custody of the suspect while he procures a warrant. According to Reisen, at the time of Balkissoon's arrest, he was aware that a DWI suspect's blood-alcohol concentration begins to diminish "as time goes on" and that, during the time that he would have spent obtaining a warrant in this case, the alcohol-concentration level in Balkissoon's blood would have been "depleting." When asked to describe how long it took him to obtain a sample of Balkissoon's blood without a warrant, Reisen testified, "Not long. As soon as I walked in [to the Williamson County Jail], we went right to the medical—I mean, after he got patted down and secured, we went right to the medical unit and took his blood right then and there."

Judge Wayne Porter, a magistrate in Williamson County, also testified during the suppression hearing. According to Porter, he works at the jail between 7:30 a.m. and 1:00 p.m. and

3

is on call after hours to sign search warrants if requested by an officer. However, Porter explained that, after he leaves the jail for the day, "[t]here's nobody in the jail until the next morning." When the State asked Porter to confirm whether, after hours, "there is nobody on duty that is available for [officers] to go to for warrants," Porter testified, "That's correct." The State also asked Porter whether Williamson County had a "24-hour magistration service," similar to the one that exists in Travis County. Porter testified that it did not.

After hearing argument, the district court denied the motion to suppress. Acknowledging the applicability of *Missouri v. McNeely*, the case in which the United States Supreme Court held that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant,"[3] the district court nevertheless concluded that the evidence should not be suppressed because Officer Reisen had acted in good-faith reliance on the law as it existed at the time of Balkissoon's arrest. The district court explained: "I believe the exclusionary rule is intended to have a punitive or corrective effect. And in this case, where the officer was acting under the statutory mandate in drawing the blood, there would be no purpose served to apply the exclusionary rule, therefore, I deny the Motion to Suppress."

The evidence related to Balkissoon's blood-alcohol content was subsequently admitted at trial. According to the evidence presented, Balkissoon's blood-alcohol content at the time it was tested was .22 grams of alcohol per 100 milliliters of blood, almost three times the legal limit. Based on this and other evidence, which we discuss in more detail below, the jury

---

[3] 133 S. Ct. 1552, 1568 (2013).

convicted Balkissoon of driving while intoxicated and assessed punishment as indicated above. The district court rendered judgment on the verdict, and this appeal followed.

## ANALYSIS

### Constitutionality of warrantless, mandatory blood draw

In his first issue, Balkissoon argues that the drawing of his blood without a warrant violated his Fourth Amendment right to be free from unreasonable searches and seizures and should have been suppressed for that reason.[4] In response, the State argues that there were exigent circumstances in this case that justified the officer's decision to draw Balkissoon's blood without a warrant and that the district court's decision to deny the motion to suppress should be sustained on that ground.

### *Standard of review*

We review a trial court's ruling on a motion to suppress for abuse of discretion.[5] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[6] "We will sustain the lower court's ruling if it is reasonably supported by the

---

[4] *See* U.S. Const. amend. IV.

[5] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[6] *Id*. (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g).

record and is correct on any theory of law applicable to the case."[7]  "The appellate court must apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations."[8]  In this case, we review de novo the trial court's application of the law of search and seizure to the facts.[9]

### *The Fourth Amendment and exigent circumstances*

The drawing of a person's blood is considered a search under the Fourth Amendment.[10]  Consequently, a blood draw generally requires a search warrant, unless a "recognized exception" to the warrant requirement applies.[11]  "'One well-recognized exception,' and the one at issue in this case, 'applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the

---

[7]  *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

[8]  *Martinez v. State*, 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)).

[9]  *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2011); *Thompson v. State*, 408 S.W.3d 614, 621 (Tex. App.—Austin 2013, no pet.); *see also State v. Villarreal*, 475 S.W.3d 784, 798 (Tex. Crim. App. 2014) ("[B]ecause the facts are undisputed and the questions before us are matters of law, we apply a de novo standard of review."); *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004) ("On appeal, the question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to de novo review.  Despite its fact-sensitive analysis, 'reasonableness' is ultimately a question of substantive Fourth Amendment law.").

[10]  *See Schmerber v. California*, 384 U.S. 757, 769 (1966).

[11]  *See McNeely*, 133 S. Ct. at 1558.

Fourth Amendment.'"[12] One such exigent circumstance is preventing the destruction of evidence or contraband.[13] In DWI cases, the evidence that is at risk of destruction is a suspect's blood-alcohol content, which "begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system."[14] Accordingly, the Supreme Court held in *Schmerber v. California* that the warrantless collection of blood from a DWI suspect does not violate the Fourth Amendment in cases "when the officer might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"[15]

More recently, however, the Supreme Court has clarified its holding in *Schmerber*, rejecting the argument that "the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk driving cases."[16] Instead, the Court has held, "exigency in this context must be determined case by case based on the totality of the circumstances."[17] Although "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood

---

[12] *Id*. (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

[13] *See Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007) (citing *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991)).

[14] *Schmerber*, 384 U.S. at 770.

[15] *Id*. (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)).

[16] *McNeely*, 133 S. Ct. at 1556.

[17] *Id*.

test," in other cases, "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[18]  This is because "some delay between the time of the arrest or accident and the time of the test is inevitable regardless of whether police officers are required to obtain a warrant."[19]  If, under the circumstances of the case, "the warrant process will not significantly increase the delay before the blood test is conducted," there can be "no plausible justification for an exception to the warrant requirement."[20]

Cases in which a warrantless blood draw might be justified include those "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident" and "there was no time to seek out a magistrate and secure a warrant."[21]  The Supreme Court has characterized such circumstances as "special facts" that could justify a warrantless blood draw.[22]  However, the Supreme Court has also cautioned that "special facts" are not always required to justify a warrantless blood draw:

> [T]he fact that a particular drunk-driving stop is 'routine' in the sense that it does not involve "'special facts,'" such as the need for the police to attend to a car accident, does not mean a warrant is required.  Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability

---

[18] *Id.*; *see also McDonald v. United States*, 335 U.S. 451, 456 (1948) ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative")

[19] *McNeely*, 133 S. Ct. at 1561.

[20] *Id.*

[21] *Schmerber*, 384 U.S. at 770-71.

[22] *See id.* at 771.

8

of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.[23]

As with other warrantless searches, the burden is on the State to prove that the warrantless blood draw was reasonable under the totality of the circumstances.[24] "We apply an objective standard of reasonableness in determining whether a warrantless search is justified, taking into account the facts and circumstances known to the police at the time of the search."[25]

In this case, the record supports a conclusion by the district court that the State satisfied its burden to prove that a warrantless blood draw was reasonable under the totality of the circumstances. These circumstances included the fact that, at the time of the offense, Williamson County did not have a "24-hour magistration service." What this meant, according to the testimony of Judge Porter, was that there was no magistrate on duty at the jail after hours. The record reflects that the traffic stop in this case occurred at approximately 2:00 a.m. Thus, the district court could have reasonably inferred that no magistrate would have been available at the jail to sign a search warrant for Balkissoon's blood and that, in order to obtain a warrant, Reisen would have needed to call the judge and arrange for a meeting. As Reisen explained in his testimony, obtaining a

---

[23] *McNeely*, 133 S. Ct. at 1568.

[24] *See Amador v. State*, 221 S.W.3d 666, 672-73 (Tex. Crim. App. 2007); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

[25] *Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998); *State v. Anderson*, 445 S.W.3d 895, 910 (Tex. App.—Beaumont 2014, no pet.).

warrant was a "lengthy process." According to Reisen, it would have required him to: (1) transport Balkissoon to the county jail, where Balkissoon would first need to be "booked in" to the jail; (2) complete paperwork to obtain a warrant and have that paperwork reviewed and approved by a prosecutor via email; (3) "drive to the Judge's house; got to get him to read over it, sign it"; (4) "drive back to the jail; sign some paperwork to get [Balkissoon] out of the jail to drive him to the hospital"; and (5) "wait at the hospital for a little bit in triage until a qualified technician comes down" and draws the blood. Reisen testified that on one occasion, this process took him approximately four hours. In contrast, Reisen testified that the process for drawing Balkissoon's blood without a warrant was "[n]ot long. As soon as I walked in [to the Williamson County Jail], we went right to the medical—I mean, after he got patted down and secured, we went right to the medical unit and took his blood right then and there." Thus, the district court could have reasonably inferred from Reisen's testimony that the "lengthy process" for obtaining a warrant would have "significantly increased the delay" prior to the blood draw in this case.

Additionally, the record reflects that Trooper Reisen stopped, investigated, and arrested Balkissoon without the assistance of other officers. Consequently, Reisen testified, if he had attempted to secure a warrant, there would have been no other officers available to assist him with completing the warrant paperwork or with taking custody of Balkissoon while Reisen began the process of securing a warrant. The record also reflects that Balkissoon's vehicle needed to be towed, and there was no other officer to assist Reisen with that task. The district court could have reasonably inferred that the absence of other officers to assist Reisen, combined with the then-existing difficulties of obtaining a warrant in Williamson County after hours, including the absence

10

of a magistrate on duty at the jail, made obtaining a warrant impractical in this case.[26]  On this record, the district court would not have erred in concluding that exigent circumstances were present here that justified Reisen's decision to proceed without a warrant and in denying the motion to suppress on that ground.[27]

We overrule Balkissoon's first issue.

**Deadly-weapon finding**

In addition to finding Balkissoon guilty of the offense of driving while intoxicated, the jury also found that Balkissoon had used or exhibited a deadly weapon—his motor

---

[26] *See McNeely*, 133 S. Ct. at 1568; *Schmerber*, 384 U.S. at 770-71; *see also Garcia v. State*, No. 14-14-00387-CR, 2015 Tex. App. LEXIS 4756, at *20-21 (Tex. App.—Houston [14th Dist.] May 12, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding that exigent circumstances were present when officer testified "that he was familiar with the procedure for obtaining a warrant and that it was a complicated and lengthy process" that would have required him to "type up a warrant, locate a judge to sign it, and return to the hospital" where suspect's blood could be drawn); *Pearson v. State*, No. 13-11-00137-CR, 2014 Tex. App. LEXIS 2514, at *10-11 (Tex. App.—Corpus Christi Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that there were exigent circumstances present when officer testified that he was "the only officer on duty," was "solely responsible for securing the scene of the accident," and had to wait "at least three hours to obtain a warrant from a judge").

[27] In its brief, the State does not address the district court's stated reason for denying the motion to suppress—that the exclusionary rule should not apply in this case because Trooper Reisen acted in good-faith reliance on a "statutory mandate."  As the State correctly notes, addressing that issue is unnecessary to the resolution of this appeal because this Court is "obligated to uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case . . . . even if the trial court gave the wrong reason for its ruling."  *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (citing *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Romero*, 800 S.W.2d at 543); *see State v. Munoz*, 474 S.W.3d 8, 12-13 (Tex. App.—El Paso 2015, pet. ref'd); *Martinez v. State*, 220 S.W.3d 183, 185 (Tex. App.—Austin 2007, no pet.).

vehicle—during the commission of the offense. In his second issue, Balkissoon argues that the evidence is insufficient to support the jury's deadly-weapon finding.

A "deadly weapon" is defined in the Texas Penal Code as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."[28] In making the determination of whether the evidence is sufficient to support a deadly-weapon finding, "[a]ppellate courts 'review the record to determine whether, after viewing the evidence in the light most favorable to the [verdict], any rational trier of fact could have found beyond a reasonable doubt that the [vehicle] was used or exhibited as a deadly weapon.'"[29] "In order to sustain a deadly-weapon finding, the evidence must demonstrate that: 1) the object meets the definition of a deadly weapon; 2) the deadly weapon was used or exhibited during the transaction on which the felony conviction was based; and 3) other people were put in actual danger."[30] "'Others' connotes individuals other than the actor himself, and danger to the actor alone does not meet the requisite standard of deadly-weapon use."[31] There must be evidence presented that the defendant's "use of his motor vehicle placed other people in actual danger of death or serious bodily injury."[32]

In this case, Trooper Reisen testified that as he was "driving west on 620 towards 183," he "noticed this vehicle coming out of the parking lot" and "traveling pretty fast." Reisen

---

[28] Tex. Penal Code § 1.07(a)(17)(B).

[29] *Brister v. State*, 449 S.W.3d 490, 493 (Tex. Crim. App. 2014) (quoting *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003)).

[30] *Id*. at 494 (citing *Drichas v. State*, 175 S.W.3d 795, 797-98 (Tex. Crim. App. 2005)).

[31] *Id*.

[32] *Id*.

12

added that the vehicle "didn't yield" as Reisen was approaching the parking lot and, as a result, Reisen "took [his] foot off the gas and watched him." According to Reisen, the vehicle then made a wide right turn across multiple traffic lanes and "[w]ent over to the turn lane, went around the turn, the 'turn only [lane],' the round-about, and started traveling east on 620." Immediately thereafter, Reisen activated his signal lights and Balkissoon pulled into a nearby parking lot and parked his vehicle. A video recording of the stop, taken from Reisen's dashboard camera, was admitted into evidence and played for the jury. According to the recording, Balkissoon's vehicle was on the road for approximately 30 seconds before being pulled over. No other traffic could be seen near Balkissoon's vehicle while it was on the road.

On cross-examination, Reisen acknowledged that there was no stop sign or other traffic-control device at the location where Balkissoon entered onto the roadway. Reisen also acknowledged that Balkissoon was not speeding as he pulled out of the parking lot or when he was on the road, nor was Balkissoon weaving, swerving, or drifting while on the road. When asked if there was "any other traffic . . . in that vicinity" at the time of the stop, Reisen testified, "Besides me, no." Reisen also agreed with defense counsel that "nobody had to take evasive action" or "honk, jump to get out of the way" as Balkissoon's vehicle entered the roadway.

On this record, even when viewing the above evidence in the light most favorable to the verdict, we cannot conclude that a rational jury could have found beyond a reasonable doubt that Balkissoon's use of his motor vehicle placed other people in actual danger of death or serious bodily injury. According to Trooper Reisen, his patrol car was the only other vehicle in the vicinity of Balkissoon's vehicle at the time of the stop, and the video recording of the stop, which showed no other vehicles near Balkissoon's vehicle, does not support a contrary finding. Moreover, there

13

is nothing in the record to support a finding that Reisen himself was placed in "actual danger of death or serious bodily injury" as a result of Balkissoon's driving. Reisen testified that as Balkissoon's vehicle entered the roadway, Reisen did not have to "slam on [his] brakes" or take any other type of evasive action in order to avoid Balkissoon. Instead, Reisen testified, he merely had to "take [his] foot of the gas." Reisen also testified that Balkissoon's vehicle was not speeding, weaving, swerving, or drifting on the road. The video recording of the stop also does not support a finding that Reisen was placed in actual danger. Although the recording showed Balkissoon enter the roadway without yielding to Reisen, there is nothing on the recording to suggest that Reisen was in any "actual danger" of colliding with Balkissoon's vehicle either at the time the vehicle entered the roadway or at any time thereafter. Because there is no evidence to support the jury's finding that Reisen or any other person was in any "actual danger of death or serious bodily injury" as a result of Balkissoon's driving, we conclude that the evidence is insufficient to support the jury's deadly-weapon finding.[33] We sustain Balkissoon's second issue.

---

[33] *See Brister*, 449 S.W.3d at 495; *Cates*, 102 S.W.3d at 738-39; *see also Pointe v. State*, 371 S.W.3d 527, 532 (Tex. App.—Beaumont 2012, no pet.) (concluding that evidence was insufficient to support deadly-weapon finding and observing that, "[w]hile a jury may draw multiple reasonable inferences from the evidence, it cannot draw conclusions based on speculation"); *Foley v. State*, 327 S.W.3d 907, 917 (Tex. App.—Corpus Christi 2010, pet. ref'd) ("Although Foley's driving may have been reckless or dangerous, it could not cause death or serious bodily injury to others because no other persons or vehicles were in the immediate vicinity of Foley's crash."); *Williams v. State*, 946 S.W.2d 432, 434-36 (Tex. App.—Fort Worth 1997), *rev'd on other grounds*, 970 S.W.2d 566 (Tex. Crim. App. 1998) (concluding that evidence was insufficient to support deadly-weapon finding because no other vehicles were on the highway "at the time and place that Williams drove in an intoxicated condition" and trooper who followed defendant's vehicle "took precautions for his own safety, as he was trained to do, and was not actually endangered").

## CONCLUSION

When the evidence is insufficient to support a deadly-weapon finding, the appropriate remedy is to delete the deadly-weapon finding.[34]  Accordingly, we modify the judgment to delete the deadly-weapon finding.  As modified, the judgment of conviction is affirmed.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Goodwin, and Field

Modified and, as Modified, Affirmed

Filed:   April 13, 2016

Do Not Publish

---

[34] *See Williams*, 970 S.W.2d at 566; *see also Boes v. State*, No. 03-03-00326-CR, 2004 Tex. App. LEXIS 6806, at *8 (Tex. App.—Austin July 29, 2004, no pet.).