# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00637-CR

---

**The State of Texas, Appellant**

**v.**

**William Navarro, Appellee**

---

**FROM THE 167TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-DC-15-302236, THE HONORABLE DAYNA BLAZEY, JUDGE PRESIDING**

---

## O P I N I O N

Appellant William Navarro pleaded guilty to indecency with a child by sexual contact and, pursuant to a plea bargain, was placed on deferred-adjudication community supervision for a period of ten years.[1] *See* Tex. Penal Code § 21.11(a)(1). The State moved to revoke Navarro's community supervision for alleged violations of its terms and conditions and to adjudicate his guilt for the indecency charge. After finding six of the alleged violations to be true, the trial court granted the motion, revoked Navarro's community supervision, and adjudicated him guilty of the offense. The court sentenced him to ten years' confinement but announced its intention to place him on "shock probation"[2] if it received a favorable report of his

---

[1] Under Texas law, the terms "community supervision" and "probation" are used interchangeably. *See Shortt v. State*, 539 S.W.3d 321, 322 n.1 (Tex. Crim. App. 2018).

[2] "Shock probation" refers to the practice of a trial court requiring a defendant to begin serving an imposed term of imprisonment but—before the expiration of 180 days—suspending

behavior while incarcerated from the Texas Department of Criminal Justice. *See* Tex. Code Crim. Proc. art. 42A.202 (governing shock probation). Navarro filed a motion for new trial, which was granted by the trial court. The State appealed and in three issues contends that the trial court abused its discretion by granting the motion because: (1) the ground on which the court based its ruling was not raised in the motion; (2) Navarro failed to demonstrate harm; and (3) the court could not grant the motion "in the interest of justice." We reverse the trial court's order granting Navarro's motion for new trial and remand the cause to the trial court for proceedings consistent with this opinion.

## BACKGROUND

In its amended motion to proceed with adjudication of guilt, the State alleged that Navarro, in violation of the terms and conditions of his community supervision, had committed three new offenses and had:

Failed to report to the supervision officer as directed on 04/07/2020, 04/14/2020 and 11/15/2021;

Failed to remain within Travis County unless given permissions to depart by Supervision officer as evidenced by his arrest in Zavala County on 03/04/22;

Failed to have a valid Texas Department of Public Safety photo driver's license;

Operated a motor vehicle without a valid Texas Driver's License;

Failed to participate in and cooperate fully in sex offender therapy as directed[;] the defendant was discharged from treatment on 03/14/22;

further execution of the sentence and placing the defendant on community supervision. *See* Tex. Code Crim. Proc. art. 42A.202(a)–(b).

2

Failed to not have contact with any minor children without another adult present who has been designated as a chaperone by the Department[']s approved sex offender therapist and the Community supervision officer as evidenced by the defendant's recent arrest where he was alone with a 9-year-old minor in his vehicle.

The trial court held a hearing on the State's motion. Zavala County Sheriff's Deputy Sebastian Mendoza testified about Navarro's March 2022 arrest. Deputy Mendoza was patrolling on Highway 57 in Zavala County around 4 a.m. when he observed and stopped a car that was "driving on the improved shoulder." *See* Tex. Transp. Code § 541.302(6) (defining "improved shoulder" as "a paved shoulder"). The car "drove over the white line on the right-hand side," and Deputy Mendoza saw the outsides of the car's passenger-side tires go "about two feet" past the line dividing the lane from the shoulder. He was not equipped with a body- or dash-cam.

Deputy Mendoza ran the car's license plate and, after identifying himself as law enforcement, informed the driver—later identified as Navarro—of the violation. Deputy Mendoza told Navarro to lower the car's rear window. When he complied, the deputy "noticed a little girl in the back seat not equipped with a seatbelt." There were no adults in the car other than Navarro. The girl, who appeared to be around nine years old, "looked exhausted" and had "grass all over her" and "sweat coming down her face." Deputy Mendoza, who testified that he was fluent in Spanish, asked Navarro in English to tell the girl to put on her seatbelt, and Navarro told her to do so in Spanish. He then told Deputy Mendoza "not to be talking to his daughter."

Deputy Mendoza instructed Navarro to provide a valid driver's license and proof of insurance. Navarro gave a driver's license to the deputy, who went to his patrol vehicle to run it. He learned that Navarro was a registered sex offender, was on probation, and was not

3

"allowed to have any children with him at all." Deputy Mendoza returned to Navarro's car and "took him out of the vehicle and detained him." However, when asked on cross-examination why he had asked Navarro to exit his car, Deputy Mendoza testified, "Just so—there was traffic going along, so I couldn't really hear him, so I went ahead and just pulled him out." Although Deputy Mendoza described the traffic at the time as "light," he explained that there were "cars here and there."

Deputy Mendoza asked the girl for her father's name, but she was not "able to give [him] an answer." He requested that Border Patrol assist in identifying the girl, and it took officers with the agency approximately twenty-five minutes to arrive. The officers took custody of the girl, and Deputy Mendoza arrested Navarro for "smuggling of a person" and drove him to the jail. Deputy Mendoza testified, "With my experience, I've r[u]n into smuggling so many times that, you know, you see people dressed in camouflaged clothing, you know, grass stains, debris all over them, sweat all over them. So I would believe that it was a human smuggling attempt."

Myra Stoddard, Navarro's probation officer, testified about his probation records, including "chronological entries" or "chronos," and compliance with his community-supervision conditions.[3] Stoddard, a records custodian for the Travis County Probation Office, explained that entries are created in the regular course of business "at or near the time of the act that is described within the entry" and are made either by someone with personal knowledge or "from information transmitted by a person with actual knowledge of the acts, events, or opinions contained within that chronological entry." Entries are not made "solely in anticipation of

---

[3] Stoddard testified that "chronological entries" are "[n]otes taken during any interaction either with a defendant or anybody else as to how they're doing and what they're doing in their probation."

4

litigation," and probation officers "have a business duty to report the information contained within those entries for any given probationer."

Stoddard had been responsible for overseeing Navarro's probation off-and-on since he was placed on community supervision in March 2017. In preparing to testify, she had reviewed her own entries as well as those made by Laura Madrid, a former Travis County probation officer.[4] Stoddard informed Navarro about his responsibilities during their first meeting. His conditions included obtaining permission before leaving Travis County and not having contact with minors other than his biological children.

Navarro's driver's license was "suspended for quite a while," and Stoddard had repeatedly reminded him that as a condition of his community supervision, he could not drive with a suspended license. Nevertheless, he told her that he had driven with an invalid license.

Stoddard described three probation appointments that Navarro had missed. On March 7, 2020, she and Navarro had a scheduled phone appointment, but "the call never happened." They met the next day after she called again and left a voice message on his phone. He also failed to call her as required on April 14, 2020. He finally called and left a message on the 21st, and they were able to meet only on the 29th.

Over defense counsel's confrontation clause objection, Stoddard testified that Navarro missed a third appointment, with Madrid, on November 15, 2021. Madrid noted that she had called him about their scheduled appointment, but he had not answered. She made contact with him on the 17th.

Stoddard testified that in addition to missing appointments and driving with an invalid license, Navarro failed to attend his sex-offender therapy as required. He had told her

---

[4] Madrid did not testify during the revocation hearing.

that he wanted to continue his sessions at Shoal Creek Counseling, but "because of his violations, they wouldn't let him back in" after his discharge. She testified that she had personal knowledge that he was currently enrolled in treatment with a provider who was not affiliated with Shoal Creek Counseling.

Navarro needed permission to travel to Zavala County, but the Travis County Probation Office had not given him permission to go there in March 2022 or to have contact with a minor child who was not his daughter. Madrid documented a conversation with Navarro on March 7th, recording that he had stated regarding his arrest that "there were some people on the side of the road that needed help, one of them was a young child, that he felt bad for those people, and [he] helped them out." He had also indicated that the girl in his car was not his daughter.

On cross-examination, Stoddard testified that Navarro had not had a valid driver's license but eventually obtained one, that he complied with his probation conditions "for the most part," and that he had missed a few sex-offender treatment sessions over a period of years. He was, however, not "actively participating" in or attending the sessions and had gone "[o]ff and on" since being enrolled in 2017. During the Covid-19 pandemic, Navarro stayed in touch by phone "[f]or the most part." "There were some times where he missed," but Stoddard "would hear from him either the next day or within a few days," and "for the most part, he wasn't trying to dodge probation or avoid [her]."

Navarro's wife Brenda testified about his missed sex-offender treatment sessions and March 2022 arrest as well as previous attempts by the State to revoke his probation. Although he knew the sessions were a required condition of his probation, he had failed to attend

6

because of his work; "he tried to make it several times. Several times he was late, [his counselor] didn't accept him in class until she ended up kicking him out."

Brenda testified that Navarro, who worked for a delivery company, went to Zavala County to look for "a job in the oil field." He left around 10 or 11 p.m. and although she did not know why the girl—who she testified was not their daughter—had been in his car, he mentioned to her that "whatever went on, like, you know, there was, you know, people or whatnot, but that's not what he went down there for." When asked if he had told her what happened, she testified, "We didn't go into detail. I didn't go into detail because I know that's not what he went down there for. I just tried to hurry up and get him out." She acknowledged that he had known he was not supposed to be in Zavala County without permission or to have unsupervised contact with unrelated children.

Brenda testified on cross-examination that the State had twice before moved to revoke Navarro's probation and adjudicate his guilt. She agreed that the first motion had been filed in 2017 after he "tested positive for cocaine." She also agreed that the second motion had been filed in 2020 because "among other things, he failed to submit to a drug test and did not have a valid driver's license." She testified that her license had also been suspended and that she and Navarro had been required to pay "penalties" before they could resolve the matter.

At the hearing's conclusion, the trial court found the six alleged violations listed above to be true but did not find true the allegations that Navarro had committed new offenses. The court revoked his community supervision and found him guilty of indecency with a child by sexual contact. Before remanding him into custody, the trial judge informed him:

I'm going to sentence you to a period of a term of incarceration in the Texas

7

Department of Criminal Justice for ten years; however I am going to retain jurisdiction over this case for 180 days. What this means is that you are going to go to the Texas Department of Criminal Justice at which you will serve no more than 180 days. Depending on the report that I get back from TDCJ, your attorney can file a motion prior to the expiration of 180 days asking that you be brought back and that I consider placing you back on probation again. I don't know that that's going to happen. It's going to be dependent on how well you do in TDCJ.

Navarro filed a motion for new trial, in which he raised the following grounds: (1) "the verdict is contrary to the law and the evidence," (2) he was "denied his right to [c]onfrontation of the [w]itnesses under the 6th Amendment of the United States Constitution," and (3) his detention following the traffic stop was unreasonably prolonged in violation of the Fourth Amendment. In addition, Navarro asserted that "the trial court has the discretion to grant a new trial in the interest of justice" and that "the error in the proceedings prejudiced his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure." *See* Tex. R. App. P. 44.2(b).

The trial court held a hearing on the motion, at which it informed the parties that it was granting the motion not for a ground raised in the motion but "in the interest of justice based on his—defendant's ground that there were error[s] in the proceedings that prejudiced his substantial rights under the standards of Rule 44.2 of the Rules of Appellate Procedure." The court stated that it had intended to place Navarro on shock probation but that it had subsequently learned that, having been adjudicated guilty of indecency with a child, he was not eligible for regular or shock probation. *See* Tex. Code Crim. Proc. arts. 42A.054(a)(7) (providing that defendants adjudged guilty of indecency with child are not eligible for judge-ordered community supervision), .202(b)(2) (providing that person who is ineligible for regular community supervision is also ineligible for shock community supervision). Thus, the court continued:

8

So that is why I'm granting the motion for new trial solely on the grounds that there was an error in the proceedings by me and that his substantial rights were impacted by that, and so Mr. Navarro's motion for new trial has been granted solely on that ground, and I am going to place him back on deferred adjudication for the original sentence. I think that we all agreed in looking at the case law, that a new trial just restored him to the position that he was in prior to the hearing. It doesn't go back to the original plea of guilty.

The trial court amended the conditions of Navarro's probation to require that he serve 180 days in jail. The State objected to the basis for the court's ruling, arguing that

[t]he [d]efense did not raise this ground of any sort of illegal sentence or any sort of granting of shock probation . . . . The State objects to the Court raising this for the Defense. It is the Defense's burden to raise any and all grounds in their motion, and the Court may not raise that on the Defense's behalf.

The trial court did not make written findings of fact or conclusions of law. This appeal followed. *See id.* art. 44.01(a)(3) (authorizing State to appeal order granting new trial in criminal case).

## DISCUSSION

### I. Standard of Review

Rule 21 of the Texas Rules of Appellate Procedure governs motions for new trial in criminal cases. *See* Tex. R. App. P. 21. "Such a motion is a prerequisite for the trial court to grant a new trial; the court may not do so on its own motion." *State v. Zalman*, 400 S.W.3d 590, 593 (Tex. Crim. App. 2013). "The legal grounds for which a trial court must grant a new trial are listed in Rule 21.3, but that list is illustrative, not exclusive." *State v. Herndon*, 215 S.W.3d 901, 907 (Tex. Crim. App. 2007). A defendant must specifically identify the bases of his claims in a motion for new trial to give the "[trial] court enough notice to prepare for the hearing and

9

make informed rulings and to allow the State enough information to prepare a rebutting argument." *Zalman*, 400 S.W.3d at 593–94; *see also Sledge v. State*, 666 S.W.3d 592, 600 (Tex. Crim. App. 2023) (noting "specificity also operates to the benefit of the parties before a reviewing court").

"The standard of review when a trial court grants a motion for a new trial is abuse of discretion." *State v. Thomas*, 428 S.W.3d 99, 103–04 (Tex. Crim. App. 2014). "The test for abuse of discretion is not whether, in the opinion of the appellate court, the facts present an appropriate case for the trial court's action, but rather, 'whether the trial court acted without reference to any guiding rules or principles.'" *Id.* at 104; *see also Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021) (stating that trial court abuses its discretion if its ruling "is arbitrary or unsupported by any reasonable view of the evidence"). "Appellate courts view the evidence in the light most favorable to the trial court's ruling, defer to the court's credibility determinations, and presume that all reasonable fact findings in support of the ruling have been made." *Thomas*, 428 S.W.3d at 104. Generally, "a trial court's ruling will be upheld if it is correct on any applicable legal theory, even if the court articulated an invalid basis." *Herndon*, 215 S.W.3d at 905 n.4. "This is the 'right ruling, wrong reason' doctrine," *id.*, and logically follows from our de novo review of the trial court's legal conclusions, *Alford v. State*, 400 S.W.3d 924, 929 (Tex. Crim. App. 2013).

The trial court's discretion, however, is not unbounded or unfettered. *Zalman*, 400 S.W.3d at 593. "A judge may not grant a new trial on mere sympathy, an inarticulate hunch, or simply because he believes the defendant received a raw deal or is innocent." *Id.* "Nor may a trial court grant a new punishment trial based only on second thoughts about the sentence that it imposed upon a defendant." *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016).

10

"In the absence of a valid legal claim of any sort to base a new punishment trial on, a court of appeals properly reverses a trial court's grant of a new trial." *Id.* A trial court would not generally abuse its discretion in granting a motion for new trial if the defendant: "(1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure." *Herndon*, 215 S.W.3d at 909.

## II.     The trial court abused its discretion by granting Navarro's motion for new trial on a ground not raised in the motion.

In its first issue, the State contends that because Navarro "did not raise the trial court's erroneous suggestion of his eligibility for shock probation as a ground for relief, the trial court could not grant a new trial on this ground." Navarro, citing *Herndon*, responds that he was not required to preserve the issue for appeal. *See* 215 S.W.3d at 909–10. He also argues that the trial court had discretion to correct its illegal sentence and to grant the motion in the interest of justice, an argument challenged by the State in its third issue.

"A trial court does not have the discretion to address new issues at a motion for new trial hearing over the State's objection." *State v. Gant*, 709 S.W.3d 707, 713 (Tex. App.—Austin 2025, pet. ref'd) (citing *Zalman*, 400 S.W.3d 590). To do so "disregards the purpose of the pleading requirement, which is . . . to give the other party notice of what is being complained of so that it can properly prepare for the hearing." *Zalman*, 400 S.W.3d at 594. This limit on a trial court's discretion accords with the longstanding rule that the court "does not have discretion to grant a new trial *unless the defendant shows that he is entitled* to one under the law." *Herndon*, 215 S.W.3d at 907 (emphasis added); *see State v. Gonzalez*, 855 S.W.2d 692, 694–95

11

(Tex. Crim. App. 1993) (holding that "the accused is required to allege sufficient grounds to apprise the trial judge and the State as to why he believes himself entitled to a new trial").

The State is correct that Navarro did not challenge the attempted grant of shock probation in his motion for new trial. Accordingly, because the State objected, the trial court abused its discretion by granting the motion on that basis. *See Zalman*, 400 S.W.3d 590; *Gant*, 709 S.W.3d at 715.

In citing *Herndon* for the proposition that he was not required to raise the issue in his motion for new trial in order for it to serve as the basis for the trial court's ruling, Navarro misconstrues the import of the Court of Criminal Appeals' holding in that case. The Court's statement that "[t]here is no requirement in Texas law that, before a trial court may grant a motion for new trial, the moving party is required to show that he has timely preserved his claim of error for appeal" referred to preservation of an issue in the underlying proceeding on direct appeal, not in the motion. *See* 215 S.W.3d at 909. Thus, the Court explained that the prevailing party "need not have preserved, *during trial*, the error that he *complained about in that post-trial motion*." *Id.* (emphasis added). In other words, while a prevailing movant may raise an issue in his motion for new trial that was not preserved at trial, he must still raise the issue in the motion for it to serve as the basis for the trial court's ruling.

A claim that a sentence is illegal may indeed be raised "at any time," *Wright v. State*, 506 S.W.3d 478, 482 (Tex. Crim. App. 2016), and "[t]here has never been anything in Texas law that prevented *any* court with jurisdiction over a criminal case from noticing and correcting an illegal sentence," *Mizell v. State*, 119 S.W.3d 804, 806 (Tex. Crim. App. 2003). However, community supervision is not part of a sentence, and an unlawful grant of probation is not an illegal or void sentence. *See Ex parte Williams*, 65 S.W.3d 656, 658 (Tex. Crim. App.

12

2001); *Speth v. State*, 6 S.W.3d 530, 532 (Tex. Crim. App. 1999); *see also State ex rel. Thomas v. Banner*, 724 S.W.2d 81, 84 (Tex. Crim. App. 1987) ("[A] judgment granting probation is not an imposed sentence."). "The sentence is the term of imprisonment assessed, while community supervision deals with whether that term of imprisonment may be suspended and the defendant supervised in his local community." *Mayes v. State*, 353 S.W.3d 790, 794 (Tex. Crim. App. 2011). Similarly, when a court orders shock probation, a sentence is imposed, and the defendant begins serving the term of confinement; "[o]nly later is the trial court given the authority to suspend further operation of that sentence and place the defendant on shock probation." *Banner*, 724 S.W.2d at 84. "The sentence ceases to operate after the last day of confinement when shock probation is granted." *Id.* Consequently, even assuming that the trial court could correct an illegal sentence by granting a new adjudication hearing, there was no illegal sentence in this case; Navarro's ten-year sentence was within the permissible statutory range for a second-degree felony, of which he was adjudicated guilty. *See* Tex. Penal Code §§ 12.33(a) (authorizing imprisonment term "of not more than 20 years or less than 2 years" for second-degree felony), 21.11(d) (classifying adjudicated offense of indecency with child as second-degree felony).

Nor was it within the trial court's discretion to grant Navarro's motion for new trial "in the interest of justice" alone. A trial court has discretion to grant a motion for new trial "in the interest of justice," but "justice" means in accordance with the law. *Herndon*, 215 S.W.3d at 907. For a trial court to grant a motion for new trial, "the movant must have articulated a valid legal claim" in the motion, *Thomas*, 428 S.W.3d at 105; "'[i]n the interest of justice' is not an independent basis for granting a new trial," *State v. Guilbault*, 644 S.W.3d 727, 734 (Tex. App.—Austin 2022, pet. ref'd); *see State v. Arizmendi*, 519 S.W.3d 143, 161 (Tex. Crim. App. 2017) (Newell, J., concurring) (noting that "'interest of justice' is not a legal claim

13

unto itself"). "There must be some legal basis underpinning the grant of a new trial, even if it is granted in the interest of justice." *Thomas*, 428 S.W.3d at 105; *see In re State ex rel. Mau v. Third Ct. of Appeals*, 560 S.W.3d 640, 647 (Tex. Crim. App. 2018) (noting that trial court may not grant new trial, "even 'in the interest of justice,' in the absence of some legal defect in the proceeding to justify its order"). Without a showing that the defendant's substantial rights were affected, "the phrase 'interest of justice' would have no substantive legal content, but constitute a mere platitude covering a multitude of unreviewable rulings." *Herndon*, 215 S.W.3d at 908.

The trial court could not, as it professed, grant Navarro's motion for new trial solely on the basis of a ground not raised in the motion. While the court was entitled to correct an illegal sentence, the sentence imposed in this case was not illegal or void and did not extend to the court's shock-probation order. And the court lacked discretion to grant the motion "in the interest of justice" as a means of modifying or vacating its grant of shock probation because Navarro did not tie his interest-of-justice request to a valid legal basis for granting the motion but rather presented it as a standalone argument. *See Guilbault*, 644 S.W.3d at 734; *Thomas*, 428 S.W.3d at 105. For these reasons, we sustain the State's first and third issues.[5]

Nevertheless, under the deferential standard applicable to a grant of a motion for new trial, we must next consider the issues that were actually raised in Navarro's motion and affirm the trial court's ruling if it is correct under any of those grounds. *See Gant*, 709 S.W.3d at 713 (concluding that trial court abused its discretion by granting motion for new trial on theory not raised in motion but proceeding to consider issues that were raised); *State v. Fury*, 186 S.W.3d 67, 73 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (noting that appellate court

---

[5] Having sustained the State's first and third issues, we need not address its second issue, in which it argued that Navarro was not harmed by the trial court's unlawful shock-probation order. *See* Tex. R. App. P. 47.1.

14

does "not consider the statements of the trial court that relate to its rationale for granting the new trial" but instead "look[s] to the grounds pleaded by the movant in the motion and determine[s] whether any of these grounds provide a basis for granting the new trial").

## III.     The adjudication of Navarro's guilt was not contrary to the law and evidence.

In the first issue raised in Navarro's motion for new trial, he contended that the "the verdict," by which we understand him to mean the revocation of his deferred-adjudication community supervision and the adjudication of his guilt, was "contrary to the law and the evidence." The Court of Criminal Appeals has held that such an allegation raises "a sufficiency challenge and *only* a sufficiency challenge." *Zalman*, 400 S.W.3d at 594.

We review issues in probation-revocation cases, including sufficiency issues, for whether the trial court abused its discretion. *See Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013). In the probation-revocation context, a trial court abuses its discretion if it revokes probation when the State has failed to meet its burden of proof. *Cardona v. State*, 665 S.W.2d 492, 493–94 (Tex. Crim. App. 1984); *accord Wade v. State*, 693 S.W.3d 861, 864 (Tex. App.—Austin 2024, no pet.). To revoke a defendant's community supervision, whether "regular" or deferred-adjudication, the State "need prove the violation of a condition of probation only by a preponderance of the evidence," which in "the probation-revocation context means 'that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation.'" *Hacker*, 389 S.W.3d at 864–65 (quoting *Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006)). The standard is "much lower" than "beyond a reasonable doubt" but "much higher" than "probable cause" and "reasonable suspicion." *Id.* at 865.

15

"Proof by a preponderance of evidence as to any one of the alleged violations of the conditions of community supervision is sufficient to support a trial court's decision to revoke community supervision and adjudicate guilt." *Cunningham v. State*, 673 S.W.3d 280, 286 (Tex. App.—Texarkana 2023, no pet.); *see Smith v. State*, 286 S.W.3d 333, 342 (Tex. Crim. App. 2009) (stating that Court of Criminal Appeals has "long held" that one sufficient ground for revocation supports order revoking community supervision). When conducting our review, we consider all evidence in the record, whether admissible or inadmissible. *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); *Cunningham*, 673 S.W.3d at 286. The trial court at a probation-revocation hearing "is the sole judge of the credibility of the witnesses and the weight to be given to their testimony," *Hacker*, 389 S.W.3d at 865, and we view the evidence in the light most favorable to the court's ruling, *see Cunningham*, 673 S.W.3d at 286; *Bell v. State*, 554 S.W.3d 742, 746 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd).

The trial court found that Navarro committed six violations of his probation conditions: (1) failure to report to his supervision officer as directed on April 7, 2020, April 14, 2020, and November 15, 2021; (2) failure to obtain permission to depart Travis County; (3) failure to possess a valid driver's license; (4) operation of a vehicle without a valid driver's license; (5) failure to participate in and complete sex-offender therapy as directed; and (6) failure to refrain from unsupervised contact with minors.

The evidence proving each of the alleged violations was uncontroverted. Stoddard testified that she had been Navarro's supervision officer off-and-on since he was placed on community supervision in 2017; that in advance of trial, she had reviewed her notes as well as those made by Madrid, Navarro's former supervisor; and that their chrono entries were made nearly contemporaneously with the events described. Stoddard also testified that she had been

16

Navarro's supervision officer on April 7th and 14th of 2020 and that he had missed scheduled phone appointments with her on those days. Madrid likewise noted in Navarro's probation file that he had missed a scheduled visit with her on November 5, 2021. Although both Stoddard and Madrid were later able to make contact with Navarro, the evidence that he missed the three required appointments was uncontested.

Stoddard testified that the Travis County Probation Office did not give Navarro permission to travel to Zavala County in March 2022 and that, while she allows her probationers to travel to counties adjacent to Travis County without first obtaining permission, Navarro needed permission to go to Zavala County. Deputy Mendoza testified about his encounter with Navarro in Zavala County and identified him in court. Moreover, Brenda agreed that Navarro "knew he wasn't supposed to go outside of the surrounding counties without telling Probation" but explained that she had thought he could go because it was "work related." She testified that he had left around 10 or 11 p.m. for "a job in the oil field" or "to look for a job."

Stoddard also testified that Navarro's license was "suspended for quite a while" and that she had repeatedly reminded him that as a condition of his supervision, he could not drive with a suspended license. Nevertheless, he admitted to her that he had done so. Brenda agreed that an earlier motion to adjudicate had been filed against Navarro because he was driving without a valid driver's license. She explained:

> For the driver's license, I really don't feel like that was—that really wasn't necessary, because, like, we—we really were trying, but we had—what are those called?—penalties, those ones where you have to pay for it and stuff. We had to pay for those first before we can get our driver's license, and mine was suspended too.

17

In addition, Stoddard testified that Navarro told her that he had been kicked out of his required sex-offender treatment with Shoal Creek Counseling and that "because of his violations, they wouldn't let him back in." She testified that he was currently enrolled in therapy with a provider who was not affiliated with Shoal Creek Counseling, to whom Navarro had been referred for treatment. Elaborating, Brenda testified that although Navarro knew that he had to attend sex-offender therapy, he had missed sessions "because of employment problems." She explained that Navarro had been late to sessions "several times" and that his counselor "didn't accept him in class until she ended up kicking him out."

Lastly, Stoddard testified that Navarro was not allowed to have contact with minors other than his biological children. On cross-examination, Brenda agreed that "it was clear that [Navarro] was not to have unsupervised contact with someone who was not his own child" and that the girl in Zavala was not their daughter. Deputy Mendoza testified that when he stopped Navarro in Zavala County, he was alone in his car with an approximately nine-year-old "little girl" who "looked exhausted," was sweating heavily, and was covered in grass. Although Navarro told Deputy Mendoza that the girl was Navarro's daughter, the girl was unable to answer when Deputy Mendoza asked who her father was, and Border Patrol later took her into custody. According to Madrid's chrono entry, Navarro told her that he had seen people on the side of the road, one of whom was "a young child," and "helped them out" because he "felt bad." He indicated to Madrid that the girl was not his daughter. On direct examination by defense counsel, Brenda testified that she did not know why "there was a passenger" in Navarro's car but that he had told Brenda that there were "people or whatnot, but that's not what he went down there for."

18

We conclude that the trial court would have abused its discretion by determining that the State failed to meet its burden of proof on any of the six alleged violations. *See Hacker*, 389 S.W.3d at 865; *Wade*, 693 S.W.3d at 865; *cf. Gant*, 709 S.W.3d at 717.

## IV.    The Confrontation Clause does not apply to deferred-adjudication community supervision revocation hearings.

In Navarro's second motion-for-new-trial issue, he contended that during the adjudication hearing, he "was denied his right to [c]onfrontation of the [w]itnesses under the 6th Amendment of the United States Constitution" because "Deputy Sebastian Mendoza and Travis County Probation Officer Myra Stoddard were permitted to testify over multiple hearsay and Confrontation Clause objections." Navarro did not make a confrontation clause objection during Deputy Mendoza's testimony. Navarro's sole confrontation clause objection, for which he obtained a running objection, was to Stoddard's testimony relating to entries made by Madrid in his probation records. The trial court overruled the confrontation clause objection on the ground that the records were admissible under the business-records exception to the hearsay prohibition, for which it found the State had laid the proper predicate.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]o implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature." *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011). There are at least three kinds of out-of-court statements that may be regarded as testimonial: (1) "ex parte in-court testimony or its functional equivalent—that is, materials such as affidavits, custodial examinations, prior testimony that the accused was unable to cross-examine, or similar pretrial

statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Langham v. State*, 305 S.W.3d 568, 575–76 (Tex. Crim. App. 2010) (quoting *Wall v. State*, 184 S.W.3d 730, 735–36 (Tex. Crim. App. 2006)).

As a threshold matter, the Court of Criminal Appeals has not determined whether the Confrontation Clause applies in hearings on motions to adjudicate guilt or to probation-revocation proceedings more broadly.[6] Although the question recently reached the Court, it concluded that the court of appeals had conflated the right to be present under the Confrontation Clause with the Due Process Clause-based right. *See Hughes v. State*, 691 S.W.3d 504, 525 (Tex. Crim. App. 2024). The Court noted, "As to whether the Confrontation Clause applies in hearings on motions to adjudicate guilt, that question will have to wait until another day." *Id.* at 520–21.

In *Gagnon v. Scarpelli*, a habeas case in which the United States Supreme Court considered whether a defendant had a right under the Fourteenth Amendment's Due Process Clause to appointed counsel at a probation-revocation hearing, the Court listed the following "minimum requirements of due process" applicable to probation-revocation cases: (1) written notice of the claimed probation violations, (2) disclosure to the probationer of the evidence against him, (3) opportunity to be heard in person and to present witnesses and documentary evidence, (4) the right to confront and cross-examine adverse witnesses ("unless the hearing

---

[6] The Court has granted review in a case where the issue may be before it. *See Montgomery v. State*, No. 02-21-00002-CR, 2022 WL 5240472, at *1 (Tex. App.—Fort Worth Oct. 6, 2022, pet. granted) (mem. op., not designated for publication).

officer specifically finds good cause for not allowing confrontation"), (5) a neutral and detached hearing body, and (6) a written statement by the factfinder as to the evidence relied on and the reasons for revoking probation.[7] 411 U.S. 778, 786 (1973) (citing *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)); *see Tapia v. State*, 462 S.W.3d 29, 41–42 (Tex. Crim. App. 2015).

The Court of Criminal Appeals, in determining whether the doctrine of *res judicata* barred a criminal prosecution in one county after a prosecutor in a second county unsuccessfully attempted to revoke the defendant's probation for committing the later-charged offense, has explained that the probation-revocation procedure in Texas "bears little resemblance to the administrative hearing described in *Scarpelli*," *Ex parte Doan*, 369 S.W.3d 205, 210 (Tex. Crim. App. 2012), and that a Texas probationer enjoys "greater safeguards than those required by *Gagnon* and *Morrissey*," *Tapia*, 462 S.W.3d at 42; *Ruedas v. State*, 586 S.W.2d 520, 523 (Tex. Crim. App. 1979) ("[T]he procedure for revoking probation in this State affords a probationer far greater safeguards than those required by *Gagnon v. Scarpelli* and *Morrissey v. Brewer*."). The Court in *Doan* rejected its previous characterization of a probation-revocation hearing as an "administrative" procedure, opting instead to designate it a "judicial" proceeding. *Doan*, 369 S.W.3d at 211–12. In doing so, the Court posited that the term "administrative" appeared to have been used in several cases as "something of a pejorative to minimize the importance of procedural and evidentiary requirements in revocation hearings." *Id.* at 211. Yet the Court acknowledged that "in some respects, there is an 'administrative' nature to a trial court's decision in a revocation hearing," including the trial court's discretion "to continue or modify the terms of community supervision rather than revoking it" even if a violation is proven. *Id.* at 212. We find it noteworthy that in choosing from among the available terms, the Court in

---

[7] Navarro did not raise a claim under the Due Process Clause.

21

*Doan* rejected classifying a probation-revocation hearing as a "criminal prosecution." *See id.*; *Guillory v. State*, 652 S.W.3d 923, 927 (Tex. App.—Eastland 2022, pet. ref'd) (emphasizing that the Court of Criminal Appeals "did not hold" that revocations hearings "constitute a phase of 'criminal prosecution' under the Sixth Amendment.").

Indeed, despite noting "the many similarities between a Texas revocation proceeding and a criminal trial" and stating that "there are few procedural differences between" the two, the Court stated that "[a] community supervision revocation hearing is distinct from a criminal trial" and that "defendants in revocation hearings do not enjoy the same panoply of procedural rights as defendants in criminal trials." *Doan*, 369 S.W.3d at 208. The Court has subsequently recognized that a revocation hearing "is conducted without the same degree of procedural protections" as a trial and underscored the "notable difference in the quality and extensiveness of the procedures followed in a motion to revoke, as compared to a criminal trial." *State v. Waters*, 560 S.W.3d 651, 662 (Tex. Crim. App. 2018); *see Hill v. State*, 480 S.W.2d 200, 202 (Tex. Crim. App. 1971) ("A probation revocation hearing is not an adversarial proceeding, a civil action, or a criminal prosecution."); *cf. Campbell v. State*, 456 S.W.2d 918, 921 (Tex. Crim. App. 1970) (declaring that it "is true that this Court has consistently held that a hearing on a motion to revoke probation is not a trial in a constitutional sense" but that "revocation proceedings cannot be isolated from the context of the criminal process"). Addressing an individual's due process rights at a parole revocation hearing, the United States Supreme Court has emphasized that "there is no thought to equate" such a proceeding "to a criminal prosecution in any sense"; it is, rather, "a narrow inquiry," and "the process should be flexible enough to consider evidence . . . that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489.

Although neither *Morrissey*, *Scarpelli*, nor *Doan* involved the Sixth Amendment's Confrontation Clause, which unlike the Fourteenth Amendment's Due Process Clause applies only to "criminal prosecutions," all three cases have been frequently discussed in decisions addressing whether the latter applies during probation-revocation hearings. *See Diaz v. State*, 172 S.W.3d 668, 671–72 (Tex. App.—San Antonio 2005, no pet.) (noting that courts have distinguished *Morrissey* and *Scarpelli* from cases concerning Confrontation Clause). One of our sister courts has discovered a split in the courts of appeals that "was created after the Texas Court of Criminal Appeals … examined *Scarpelli* and *Morrissey*" in *Doan*. *Cunningham v. State*, 673 S.W.3d 280, 289 (Tex. App.—Texarkana 2023, no pet.). As recognized by our sister court, prior to *Doan*, the intermediate courts of appeals "routinely found that the Confrontation Clause and, consequently, *Crawford* did not apply in those hearings." *Id.* at 288–89 (listing cases). Although the post-*Doan* landscape is more nuanced, the Court of Criminal Appeals "has not overruled any pre-*Doan* intermediate appellate court decisions holding that the Confrontation Clause does not apply in revocation proceedings." *Guillory*, 652 S.W.3d at 928; *see also Smart v. State*, 153 S.W.3d 118, 120–21 (Tex. App.—Beaumont 2004, pet. ref'd) (where defendant challenged admission of probation records, which were admitted through probation officer other than officer who had prepared them, concluding that "community supervision revocation is not a stage of a criminal prosecution").

Since *Doan*, a majority of the courts who have evaluated whether the Confrontation Clause applies to revocation proceedings have concluded that a probationer does not enjoy a Sixth Amendment confrontation right because such proceedings are not a stage in a criminal prosecution. *Compare Cunningham*, 673 S.W.3d at 289–90 (finding that adjudication hearing was part of criminal prosecution and, thus, that right to confrontation applies); *Hughes*

23

*v. State*, 651 S.W.3d 461, 467 (Tex. App.—Houston [14th Dist.] 2022), *aff'd* 691 S.W.3d at 525,[8] *with Guillory*, 652 S.W.3d at 928 (concluding that Confrontation Clause "does not apply to community supervision revocation hearings" and surveying intermediate court decisions); *Olabode v. State*, 575 S.W.3d 878, 881 (Tex. App.—Dallas 2019, pet. ref'd) ("By its own terms, the Confrontation Clause applies only to criminal prosecutions, and a probation revocation, whether it follows 'regular' probation or deferred adjudication probation, is not a stage of criminal prosecutions."). Nine of the federal circuit courts of appeals have likewise held that "the Sixth Amendment does not apply in hearings for the revocation of supervised release, probation, or parole" because the Amendment "applies only to 'criminal prosecutions.'" *United States v. Reese*, 775 F.3d 1327, 1329 (11th Cir. 2015) (listing cases).

We join our sister courts and federal courts in holding that a deferred-adjudication community-supervision revocation hearing is not a stage in a criminal prosecution at which the Sixth Amendment right to confrontation applies. Thus, assuming without deciding that a confrontation violation occurred, the trial court would have abused its discretion by granting Navarro's motion for new trial for a violation of that right.

## V. Deputy Mendoza's Traffic Stop Was Not Unreasonably Prolonged.

The third issue raised in Navarro's motion for new trial contended that Deputy Mendoza's traffic stop was prolonged in violation of the Fourth Amendment because he detained

---

[8] Although the Court of Criminal Appeals determined that the Fourteenth Court was mistaken in performing a Sixth Amendment confrontation analysis, *see Hughes v. State*, 691 S.W.3d 504, 525 (Tex. Crim. App. 2024), the intermediate court would have rejected decisions that "concluded that the Confrontation Clause does not apply to community supervision revocation proceedings" because the decisions "do not recognize the importance of *Doan*," *Hughes v. State*, 651 S.W.3d 461, 467 (Tex. App.—Houston [14th Dist.] 2022), *aff'd* 691 S.W.3d at 525.

Navarro "with no legal justification for an additional 30 minutes before another deputy and U.S. Border Patrol arrived."[9]  Navarro appears to argue that the stop became unreasonably prolonged when, instead of issuing him a traffic citation, Deputy Mendoza called for the assistance of Border Patrol officers, who Deputy Mendoza testified during the adjudication hearing arrived around twenty-five minutes after he spoke with the girl in Navarro's car.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Under the Amendment, drivers have "a reasonable expectation of privacy in not being detained pursuant to a traffic stop for longer than is necessary for the officer to complete his investigation."  *State v. Pettit*, 713 S.W.3d 834, 840 (Tex. Crim. App. 2025); *see Kothe v. State*, 152 S.W.3d 54, 63–64 (Tex. Crim. App. 2004) (declaring that "the general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop").  A stop that is reasonable at its inception "may violate the Fourth Amendment by virtue of its intolerable intensity and scope."  *Terry v. Ohio*, 392 U.S. 1, 17–19 (1968); *see Kothe*, 152 S.W.3d at 63–64.

When an officer conducts a traffic stop, the stop typically ends when the officer has fully investigated the traffic violation and either determined that no violation occurred or issued a citation or warning.  *See Kothe*, 152 S.W.3d at 64; *Thompson v. State*, 408 S.W.3d 614, 622 (Tex. App.—Austin 2013, no pet.).  There is, however, an "additional component to a routine traffic stop—the license and warrants check."  *Kothe*, 152 S.W.3d at 63.  During the investigation, the officer has the right to request a driver's license, car registration, insurance

---

[9]  Navarro did not contest the existence of reasonable suspicion for the stop in his motion for new trial and in his brief does not list a challenge to the stop's legality among the issues raised by the motion.  As framed in his brief, Navarro in his motion "raised the separate legal claim of a prolonged detention during the initial vehicle stop."

papers, information on the ownership of the vehicle, the driver's destination, and the purpose of the trip. *Id.*; *Thompson*, 408 S.W.3d at 622. The officer may also conduct a computer check on that information, *Kothe*, 152 S.W.3d at 63, and may question any passengers in the vehicle with their consent, *St. George v. State*, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007). "It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved. *Kothe*, 152 S.W.3d at 63; *Thompson*, 408 S.W.3d at 622. At that point, the detention must end, and the driver must be permitted to leave. *Kothe*, 152 S.W.3d at 63; *Thompson*, 408 S.W.3d at 622. "Continued detention is justified only if the officer has developed reasonable suspicion that the detainee is or will be engaged in criminal activity." *Thompson*, 408 S.W.3d at 622; *cf. Lerma v. State*, 543 S.W.3d 184, 191 (Tex. Crim. App. 2018) ("[I]f an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end."). "Each case involving an officer's stop must be evaluated objectively, under the totality of the circumstances, to determine whether the officer acted reasonably." *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018).

Deputy Mendoza testified that he stopped Navarro for driving on the highway's improved shoulder. *See* Tex. Transp. Code § 545.058 (providing that driver may only drive on improved shoulder in enumerated circumstances); *see also State v. Cortez*, 543 S.W.3d 198, 204–05 (Tex. Crim. App. 2018) ("[A]n officer would have reasonable suspicion to stop a vehicle that was driving on an improved shoulder—if it appears that driving on the improved shoulder was not necessary to achieving one of the seven approved purposes *or* it appears that driving on

26

the improved shoulder could not be done safely."). The deputy began his investigation by running the car's license plates and instructing Navarro to provide a valid driver's license and proof of insurance. Although a warrant and license check "cannot be used solely as a means to extend a detention once the reasonable suspicion forming the basis for the stop has been dispelled," *Kothe*, 152 S.W.3d at 64, "Fourth Amendment precedent does not dictate that an officer making a traffic stop must investigate the situation in a particular order"; a license check "only unduly prolongs the detention when the officer's action is unreasonable under the circumstances," *Lerma*, 543 S.W.3d at 195. The Court of Criminal Appeals has previously determined that even if an officer "may have decided that he was not going to issue a citation to the driver for the traffic violation," the traffic stop is not "complete," and the officer engages in a "reasonable course of action" when he asks the driver to exit the vehicle, questions him, and runs a computer check on his driver's license. *Id.* at 197.

At the stop's inception and before requesting Navarro's license, Deputy Mendoza ordered him to roll down the car's rear window and "noticed a little girl in the back seat not equipped with a seatbelt," which is a further traffic violation. *See* Tex. Transp. Code § 545.413(b) (providing that driver commits offense if he allows child younger than seventeen to ride in vehicle without requiring child to be secured by safety belt, provided that child is occupying seat equipped with safety belt). Deputy Mendoza observed that that the girl appeared to be around nine years old; that "she looked exhausted, she had grass all over her, and she had sweat coming down her face"; and that there were no other adults in the car. He instructed Navarro to tell the girl to put her seatbelt on, and Navarro did so in Spanish and told Deputy Mendoza "not to be talking to his daughter." Deputy Mendoza returned to his patrol vehicle, ran

27

Navarro's license, and learned that he was a registered sex offender and probationer who "wasn't allowed to have any children with him at all."

Until this point, Deputy Mendoza's actions were reasonable in pursuing a valid component of the traffic stop—the license and warrant check. *See Lerma*, 543 S.W.3d at 195; *Kothe*, 152 S.W.3d at 63; *Thompson*, 408 S.W.3d at 622; *see also Kothe*, 152 S.W.3d at 66 ("Deputy Forslund's decision to return to his vehicle and simply wait a few minutes for the warrant-check results before releasing Mr. Kothe was 'reasonable' as a matter of substantive Fourth Amendment law."). And we are unable to identify any potentially incriminatory evidence in the record that was obtained after the computer check. Because no Fourth Amendment violation occurred prior to when the evidence against Navarro was obtained, we need not determine whether Deputy Mendoza had reasonable suspicion to prolong the traffic stop until Border Patrol arrived. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) (explaining that exclusionary rule applies to evidence obtained directly or indirectly from Fourth Amendment violation); *Overshown v. State*, 329 S.W.3d 201, 205–06 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("[E]ven if a stop becomes unlawful after its inception, only the evidence obtained because of the Fourth Amendment violation—that is, after the stop became unlawful—may be suppressed as 'fruit of the poisonous tree.'").

It is possible that Navarro intended to assert that the illegally obtained evidence consisted of the fact that the girl found in his car was later taken into custody by Border Patrol—a fact supporting the inference that she was not his daughter. Yet the idea that the child must not have been his in order for him to have violated the conditions of his community supervision came from the inaccurate testimony of Stoddard and Brenda, who each testified that Navarro was not allowed to have contact with children who were not his biologically. The relevant condition

28

of Navarro's community supervision required that he "[h]ave no contact with minor children without another adult present who has been designated as chaperon[e] by the Department's approved sex offender therapist and the Community Supervision Officer."  Accordingly, the State alleged in its motion to adjudicate that he:

> [f]ailed to not have contact with any minor children without another adult present who has been designated as a chaperone by the Departments approved sex offender therapist and the Community supervision officer as evidenced by the defendant's recent arrest where he was alone with a 9-year-old minor in his vehicle.

The condition is notably silent regarding Navarro's biological children, and the allegation did not require the State to prove that the girl was not his child.  Moreover, even assuming that it resulted from a Fourth Amendment violation, admission of the fact would in any case have been harmless under Rule 44.2(a) because other evidence explicitly established that the girl was not Navarro's daughter.  Brenda testified that the girl in Navarro's car was not hers, and Stoddard related Madrid's note that Navarro had "indicated that that was not his daughter" and had explained that he had attempted to help "some people on the side of the road," one of whom was "a young child."  *See* Tex. R. App. P. 44.2(a); *Platter v. State*, 600 S.W.2d 803, 806 (Tex. Crim. App. 1980) (concluding that admission of illegally obtained evidence was harmless beyond reasonable doubt because "[t]here was a substantial quantity of other evidence, however, that tended to establish the identical facts").

For these reasons, the trial court would have abused its discretion by granting Navarro's motion for new trial on the basis of his third issue.

## CONCLUSION

The trial court had no discretion to grant Navarro's motion for new trial based on a ground not raised in the motion. *See Herndon*, 215 S.W.3d at 907 (stating that trial judge may not grant motion for new trial "on mere sympathy" or because she "personally believes that the defendant 'received a raw deal'"). And, applying a deferential standard of review, we conclude the granting of a new trial based on the grounds raised in the motion for new trial would have been an abuse of discretion. We vacate the order granting the motion for new trial and remand the cause to the trial court for proceedings consistent with this opinion.

_____

Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Reversed and Remanded

Filed:   October 17, 2025

Publish

30